IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| DW AINA LE 'A DEVELOPMENT, LLC, | ) ) ) | CIVIL NO. 17-00113 SOM-WRP |
| Plaintiff, | ) ) | **ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR LEAVE TO AMEND** |
| vs. | ) ) ) | |
| STATE OF HAWAII, LAND USE COMMISSION; STATE OF HAWAII and DOE GOVERNMENTAL UNITES 1-10, | ) ) ) ) ) | |
| Defendants. | ) ) | |
| _____ | ) | |

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR LEAVE TO AMEND**

**I.   INTRODUCTION.**

On April 25, 2011, Hawaii's Land Use Commission changed the zoning designation of over 1,000 acres of land on the Big Island from urban to agricultural (the "Reversion Order"). Although the land had many years earlier been classified as agricultural, it had by 2011 long been classified as urban, a classification that allowed a planned development. The owners of the property challenged the Reversion Order in the courts, and on November 25, 2014, the Hawaii Supreme Court affirmed a lower court decision vacating the Reversion Order. *DW Aina Lea Dev., LLC v. Bridge Aina Lea, LLC.*, 134 Haw. 187, 339 P.3d 685 (2014). In the present action, Plaintiff DW Aina Le 'a Development claims that, until vacated, the Reversion Order was a "regulatory taking" and that DW is entitled to just

1

compensation under the Fifth Amendment as a result of that alleged taking.

Defendants the State of Hawaii and the State's Land Use Commission now move for summary judgment.  They contend that DW lacks standing for two reasons: (1) DW did not have a property interest that was "taken" by the Reversion Order, and (2) even if it did, DW assigned the right to bring that takings claim to its corporate subsidiary, Aina Le'a, Inc.[1]

Defendants are not entitled to summary judgment on the first ground.  In a case that, like this case, involves a temporary regulatory taking, the property interest that is "taken" is the owner's right to use the property to produce income or an expected profit.  *Wheeler v. City of Pleasant Grove*, 833 F.2d 267, 270 (11th Cir. 1987); *see also Bridge Aina Le'a, LLC v. Land Use Comm'n*, 950 F.3d 610, 632 n.12 (9th Cir. 2020) (adopting *Wheeler*).  The question of whether DW had the right to possess the property at issue and use it to produce income or a profit when the Land Use Commission issued the Reversion Order raises genuine issues of material fact.

Defendants are, however, entitled to summary judgment on the second ground.  Several points are not in dispute.  DW

---

[1] In 2012, Aina Le'a, LLC, changed its name to Aina Le'a, Inc. ECF No. 79, PageID # 2394, ¶ 16.  To avoid confusion, this order refers to that entity simply as Aina Le'a.

does not challenge Defendants' assertion that it had to have standing at the beginning of this action.  It also accepts that a party who has assigned a claim away lacks standing to pursue that claim.  And finally, there is no dispute that DW had, at least on or before May 14, 2019, assigned its claims to Aina Le'a, an assignment reflected in an order of the bankruptcy court.

In their motion, Defendants contend that DW lacked standing when it filed suit because the assignment referred to in the bankruptcy court's order occurred before February 23, 2017, when DW filed its initial complaint.  DW responded with obfuscation.  It has refused to even state when the assignment discussed in the bankruptcy court's order occurred.  Moreover, it has failed to offer any coherent argument in support of its standing or this court's jurisdiction.

DW has the burden of establishing its standing.  Because it has not pointed to any evidence that raises a genuine issue of material fact on the question of whether it had standing when this case began, Defendants' motion for summary judgment is granted.

Finally, after reviewing Defendants' motion for summary judgment, DW apparently realized that it possibly should have included Aina Le'a as a party.  DW therefore sought leave to amend the complaint to add Aina Le'a as a plaintiff.  It is

3

now clear, however, that after Defendants filed their motion for summary judgment, Aina Le'a assigned the claims at issue in this action *back* to DW.  At this point, Aina Le'a has no interest in the outcome of this action.  The motion for leave to amend is denied.

## II.  BACKGROUND.

### A.    The Property.

This case concerns the classification of over 1,000 acres of land in South Kohala on the island of Hawaii.  ECF No. 72, PageID # 543, ¶ 1; ECF No. 79, PageID # 2389, ¶ 1.  Both parties agree that, in 1989, the State's Land Use Commission reclassified the land's zoning designation from agricultural to urban to allow the development of almost 2,000 homes, with facilities and amenities, as part of a residential community.  ECF No. 72, PageID # 544, ¶ 2; ECF No. 79, PageID # 2389, ¶ 2.  The reclassification was subject to various conditions, including a condition that a certain percentage of the housing units be affordable.  *See* ECF No. 72, PageID # 544, ¶ 4; ECF No. 79, PageID # 2390, ¶ 4.  From 1990 until 2008, the Land Use Commission amended and revised the original order's affordable housing condition several times, working with various successor landowners and developers.  *See, e.g.*, ECF No. 72, PageID # 544, ¶ 6; ECF No. 79, PageID # 2390, ¶ 6.  In 2008, however, after 18 years had passed without the construction of affordable housing,

4

the Land Use Commission issued an order to show cause as to why the land "should not revert back to [an agricultural] classification" because no affordable housing had been built. ECF No. 72-10.

### B.    The First Agreement.

On February 9, 2009, before the Land Use Commission had issued a decision on the order to show cause, DW entered into a Purchase and Sale Agreement (the "First Agreement") with the owner of the property, Bridge Aina Le'a, LLC.  That agreement concerned four different parcels of land: (1) the "Affordable Housing Parcels"; (2) the "Residential Property"; (3) the "Retail Property"; and (4) the Ouli Wells.  ECF No. 72-11, PageID # 815-16, 819.  In addition to requiring a $50,000 down payment, *see id.* at 823, the Agreement obligated DW to make sequential payments to obtain title to the four different parcels:

- By June 1, 2009 (the "Affordable Housing Closing Date"), DW agreed to pay Bridge $4 million in return for title to the Affordable Housing Parcels.  ECF No. 72-11, PageID # 823, 829.

- By September 30, 2009 (the "Residential Property Closing Date"), DW agreed to pay Bridge $11.5 million[2] in return for title to the Residential Property and an additional $2 million as a

_____

[2] The First Agreement established a complicated series of offsets not relevant to the present motion.  ECF No. 72-11, PageID # 824.

nonrefundable deposit against the purchase price of the Retail Property. *Id.* at 824, 829.

- By October 31, 2009 (the "Retail Property Closing Date"), DW agreed to pay Bridge $25.2 million in return for title to the Retail Property. *Id.*

- By the Ouli Wells closing date, DW was entitled to a leasehold interest in the Ouli Wells. *Id.* at 822. The Agreement defined the Ouli Wells closing date as "the first to occur (if any) of the following dates: (a) the second to occur of the Affordable Housing Parcel Closing Date and the Residential Property Closing Date; (b) the provision by [DW] . . . of [a performance and payment bond] . . . ;" or (c) the date DW chose to make an additional payment of $5 million to Bridge.

*Id.* at 829.

Several other provisions in the First Agreement are relevant to the present motion.

*First*, Bridge agreed to allow DW to possess the Affordable Housing Property, the Residential Property, and the Retail Property prior to the closing dates for those three parcels:

> **PRE-CLOSING POSSESSION/DEVELOPMENT RESPONSIBILITY.** From and after the Effective Date and prior to any Closing, *for so long as Buyer is not in default of its obligations under this Agreement*, and upon and subject to the terms and conditions of this Agreement, *Seller shall deliver to Buyer exclusive possession of the Urban Land*[3]. . . .

---

[3] The "Urban Land" included the Affordable Housing Property, the Residential Property, and the Retail Property. *See id.* at 814.

*Id.* at 831 (emphasis added).

       *Second*, the parties agreed that DW could cancel the

Agreement in the event of a substantial condemnation or taking:

> **EMINENT DOMAIN.** For purposes of this
> Agreement, a **"minor condemnation"** shall be
> any taking or condemnation by any body
> having the power of condemnation or eminent
> domain which causes damages of less than
> [$500,000.00] to the Property and that does
> not affect access from the highway adjacent
> to the Property. Any other taking or
> condemnation shall be a "major
> condemnation." If prior to any Closing the
> applicable Property is subjected to a major
> or minor condemnation of which Seller
> becomes aware, Seller shall give Buyer
> prompt written notice thereof. . . . *If such
> condemnation is a major condemnation, the
> real property subject to the major
> condemnation shall be considered a defective
> parcel and Buyer shall have the right to
> terminate this Agreement*, the Retail Deposit
> shall be returned to Buyer, and the Parties
> will be released from any further liability
> hereunder, except as otherwise expressly
> provided herein.

*Id.* at 832 (emphasis added).

       *Third*, DW agreed that if it defaulted on its

obligations, Bridge could cancel the Agreement or sue for

specific performance:

> **DEFAULT BY SELLER OR BUYER.** . . . If, under
> the provisions of this Agreement, Buyer
> shall be obligated to complete any
> conveyance transaction but fails to do so
> within the applicable period provided for
> Closing, or shall otherwise fail to perform
> any of the other obligations of Buyer
> hereunder within the required time period
> and such applicable cure periods have

> expired, Seller shall have the right, as its
> sole and exclusive remedy for such default,
> to terminate this Agreement, retaining any
> deposits including the Retail Deposit and
> other payments made hereunder to the date of
> such default.

*Id.* at 834.

On December 11, 2009, DW and Bridge modified the First Agreement.  ECF No. 72-17.  DW assigned its right to purchase the Affordable Housing Parcels to Aina Le'a, DW's wholly owned subsidiary.  *Id.* at 886.  On December 11, 2009, the sale of the Affordable Housing Parcels closed.  ECF No. 72-19.

The modification also changed the closing dates for the Residential Property and the Retail Property.  ECF No. 72-17, PageID # 887.  The Residential Property closing date was delayed until December 31, 2009, and the Retail Property closing date was delayed until February 28, 2010.  *Id.*  DW therefore had to pay Bridge $11.5 million by December 31, 2009, to obtain title to the Residential Property, and $25.2 million by February 28, 2010, to obtain title to the Retail Property.

DW was unable to make either payment.  ECF No. 72, PageID # 546, ¶ 13; ECF No. 79, PageID # 2329, ¶ 13; *see also* ECF No. 72-28, PageID # 1152.  According to a disclosure by Aina Le'a during bankruptcy proceedings, however, that failure did not lead to DW's immediate default.  Instead, Aina Le'a claimed that "from January 2010 through November 25, 2014, performance

under the [First Agreement was] suspended." ECF No. 78-5, PageID # 2277. Similarly, Robert Wessels, a DW executive, submitted a declaration stating that DW's failure to make the requisite payments did not terminate the First Agreement. ECF No. 78-6, PageID # 2383. Wessels instead contends that the closing dates were "extended within the parameters of the agreement." *Id.*

It is not clear from the record that Bridge agreed that the parties' obligations were suspended until November 25, 2014. A 2015 agreement between Bridge and Aina Le'a notes that, at some point, Bridge and DW had "taken different positions regarding whether the [First Agreement]" had been terminated. ECF No. 72-26, PageID # 1111. The record does not reflect *when* Bridge believed that the termination occurred.

### C.   The Reversion Order.

After DW agreed to purchase the Property from Bridge, both DW and Bridge appeared before the Land Use Commission several times to respond to the Commission's order to show cause. On April 25, 2011, after proceedings spanning years, the Commission ordered the land reverted from its urban classification back to its original agricultural use. ECF No. 72, PageID # 545, ¶ 7; ECF No. 79, PageID # 2391, ¶ 7.

Bridge and DW appealed to Hawaii's Circuit Court of the Third Circuit, a state trial court. *See id.* In January

9

2012, while that appeal was pending, DW assigned the right to purchase the Residential Property to Aina Leʻa in return for $17 million (the "2012 Assignment"). ECF No. 72-23. Aina Leʻa paid that amount by issuing "an unsecured note" that was to "be paid by the proceeds of future parcel resales" from the Residential Property. *Id.* at 1072. DW also transferred "the rights and obligations as Buyer" under the First Agreement to Aina Leʻa. *Id.* DW retained the rights to develop the Residential Property. *See generally* ECF Nos. 78-1, 78-2, 78-3.

On June 15, 2012, the state trial court vacated the Reversion Order. *See DW Aina Lea Dev., LLC v. Bridge Aina Lea, LLC.*, 134 Haw. 187, 206, 339 P.3d 685, 704 (2014). The State appealed the state trial court's order, and the case was ultimately heard by the Hawaii Supreme Court.[4]

On November 25, 2014, the Hawaii Supreme Court affirmed. It held that the Land Use Commission "erred in reverting the land without complying with the requirements of HRS § 205-4 because the landowners had substantially commenced use of the land in accordance with the representations they had made to the Commission." *Id.* at 190, 339 P.3d at 688. The court observed that, by the time the land was reverted to agricultural use, DW "had substantially commenced use of the

---

[4] The record does not indicate whether the trial court stayed its decision while the appeal was pending.

land in accordance with [its] representations" to the Land Use Commission and had spent more than $20 million on the project. *Id.* at 191, 339 P.3d at 689.

### D. Aina Leʻa Purchases the Residential Property.

After the Hawaii Supreme Court issued its decision, it appears that Aina Leʻa attempted to purchase the Residential Property under the terms of the First Agreement, but that Bridge took the position that the First Agreement had been terminated. *See* ECF No. 72-26, PageID # 1111. Eventually, on April 24, 2015, Aina Leʻa filed suit against Bridge seeking specific performance. ECF No. 78-5, PageID # 2277.

That dispute was resolved on October 16, 2015, when Bridge and Aina Leʻa entered into a Second Purchase and Sale Agreement (the "Second Agreement"). ECF No. 72-26. That agreement stated that "without prejudice to the parties' respective positions on the termination of the [First Agreement]," the First Agreement was "superseded by the [Second Agreement]." *Id.* at 1111.

Under the terms of the Second Agreement, Aina Leʻa paid $24,000,000 for the Residential Property. *Id.* at 1106. On the same date, DW and Aina Leʻa signed a separate contract stating that DW would have "no further interest in [the Aina Leʻa properties]." ECF No. 72-28, PageID # 1153.

11

The Second Agreement closed on November 17, 2015, and Bridge transferred the Residential Property to Aina Le'a. ECF No. 72-27. On the same date, Bridge leased the Ouli Wells to Aina Le'a. ECF No. 81-2. The record does not reveal whether either DW or Aina Le'a ever purchased the Retail Property from Bridge.

**E.  DW's Complaint.**

On February 23, 2017, DW filed the present action in state court. ECF No. 1-2. DW's complaint sought just compensation from the State for the alleged regulatory taking under the Fifth Amendment (Count I). ECF No. 1-2. DW also sought attorneys' fees under 42 U.S.C. § 1988 (Count II). *Id.* On March 13, 2017, Defendants removed the case to federal court. ECF No. 1.

On March 22, 2017, Defendants filed a motion to dismiss DW's complaint. ECF No. 5. On June 13, 2017, this court granted the motion. This court held that DW's Takings Clause claims were time-barred under either Haw. Rev. Stat. § 657-7, which governs personal injury actions, or Haw. Rev. Stat. § 661-5, which applies to claims against the State of Hawaii. ECF No. 17, PageID # 191-200. DW's complaint was filed after the two year-limitations period established by both statutes. *Id.* DW filed a notice of appeal on June 20, 2017.

F.    **Bankruptcy Proceedings.**

Two days later, on June 22, 2017, Aina Le'a filed for chapter 11 bankruptcy.  ECF No. 72-39, PageID # 1615.  On May 24, 2019, the bankruptcy court approved a plan reorganizing Aina Le'a.  *See generally id*.  As part of the order, the bankruptcy court recognized that Aina Le'a retained:

> All Rights of Action that were or could be asserted by the Debtor's predecessor-in-interest, DW Aina Le'a Development, LLC [in this action[5]] based on the decision and order by Defendants to reclassify the Debtor's land from urban classification to agricultural classification in violation of Plaintiff's constitutional and other rights.

*Id.*, PageID # 1667.  The order therefore suggested that, at some point, DW had assigned the claims at issue in this action to Aina Le'a.  The order further clarified that Aina Le'a had the "exclusive" right to bring those claims.  *Id.* at 1643.

G.    **The Present Motions.**

On January 7, 2022, Defendants filed the present motion for summary judgment.  ECF No. 71.  According to Defendants, DW does not have a viable Takings Clause claim.  *See id*.  Defendants also argue that DW lacked standing because, as

---

[5] There appears to be a typographical error in the order, which refers to Case No. 17-1-3**02**-02-KTN filed in the Circuit Court of the First Circuit of the State of Hawaii.  Before it was removed, this case was designated as Case No. 17-1-03**04**-02 KTN. The parties do not dispute that the bankruptcy order referred to this action.

the plan confirmed by the bankruptcy court establishes, DW had assigned the right to bring the claims at issue in this action to Aina Le'a.  *See id.*

On February 4, 2022, after reviewing Defendants' motion, DW apparently recognized that Aina Le'a might be the proper party to bring a Takings Clause claim against the State. DW therefore filed a motion to amend the complaint to add Aina Le'a as a party.  ECF No. 76.

### H.    The 2022 Assignment.

On March 9, 2022, well after Defendants asserted that they were entitled to summary judgment because DW had assigned the claims at issue in this action to Aina Le'a, Aina Le'a assigned the claims *back* to DW.  According to the Second Amendment to Purchase/Transfer Agreement (the "2022 Assignment"):

> NOW THEREFORE to further clarify the agreement between [DW and Aina Le'a], the following is agreed upon:
>
> . . . .
>
> a. Aina Le'a . . . assigns to [DW] the right to bring any and all claims against the State as alleged in [this Action].

ECF No. 88-5, PageID # 2653.

The 2022 Assignment is dated January 29, 2021.  *Id.* at 2652.  At a hearing, however, this court questioned the authenticity of the document, which allegedly had not been

14

produced in discovery.  Eventually, DW admitted that the document "was drafted . . . on March 7, 2022 and finalized on March 9, 2022."  ECF No. 93, PageID # 2673.

DW nevertheless contends that the parties had "always agreed" that DW would prosecute this action on behalf of Aina Le'a, and that the 2022 Assignment simply formalized that agreement.  ECF No. 102, PageID # 2743-44.  No admissible evidence supports that assertion.  This court notes that DW has frustrated this court's efforts to ascertain which entity had the right to sue at what time.  DW's assertions sometimes lack support in documents in the record, and are sometimes actually contradicted by the very documents that DW cites.  The statement that the parties had "always agreed" that DW would file suit is an excellent example of this.

To substantiate this assertion, DW cites the minutes of a December 16, 2016, special meeting of Aina Le'a's board of directors.  DW maintains that the minutes show that Aina Le'a agreed that "DW would commence the action on behalf of DW [and] Aina Le'a."  ECF No. 102, PageID # 2743.  The opposite is true.  The minutes state that "[a] discussion was held concerning *the Company's* [*i.e.*, Aina Le'a's] taking[s] claim against the State of Hawaii *on behalf of DW* [and] the Company."  ECF No. 102-1, PageID # 2749 (emphases added).  Aina Le'a's officers were "authorized to execute and deliver on behalf of the Company any

15

and all documents necessary to file suit." *Id.* The minutes reflect the belief that the claims would be brought by Aina Le'a, not DW.

DW also maintains that Aina Le'a orally assigned the claims back to DW in January of 2021. *See, e.g.*, ECF No. 102, PageID # 2743 (discussing an oral assignment); *see also* ECF No. 93, PageID # 2673 (appearing to discuss an oral assignment that occurred in January 2021). No evidence supports that assertion. DW has not established the existence of an oral assignment by, for instance, submitting an affidavit or declaration from an officer or director of either company.

In the absence of any admissible evidence of an earlier assignment, this court is left with the only evidence in the record: the 2022 Assignment. DW has admitted that that document was signed on March 9, 2022. For the purposes of deciding this motion, this court therefore treats that document as the only assignment of the claims at issue from Aina Le'a back to DW, an assignment that occurred on March 9, 2022.

III.    **LEGAL STANDARD.**

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment shall be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130,

16

1134 (9th Cir. 2000).  The movants must support their position
concerning whether a material fact is genuinely disputed by
either "citing to particular parts of materials in the record,
including depositions, documents, electronically stored
information, affidavits or declarations, stipulations (including
those made for the purposes of the motion only), admissions,
interrogatory answers, or other materials"; or "showing that the
materials cited do not establish the absence or presence of a
genuine dispute, or that an adverse party cannot produce
admissible evidence to support the fact."  Fed. R. Civ. P.
56(c).  One of the principal purposes of summary judgment is to
identify and dispose of factually unsupported claims and
defenses.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24
(1986).

Summary judgment must be granted against a party that
fails to demonstrate facts to establish what will be an
essential element at trial.  *See id.* at 323.  A moving party
without the ultimate burden of persuasion at trial--usually, but
not always, the defendant--has both the initial burden of
production and the ultimate burden of persuasion on a motion for
summary judgment.  *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*,
210 F.3d 1099, 1102 (9th Cir. 2000).

The burden initially falls on the moving party to
identify for the court those "portions of the materials on file

17

that it believes demonstrate the absence of any genuine issue of material fact." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citing *Celotex Corp.*, 477 U.S. at 323). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (footnote omitted).

The nonmoving party may not rely on the mere allegations in the pleadings and instead must set forth specific facts showing that there is a genuine issue for trial. *T.W. Elec. Serv.*, 809 F.2d at 630. At least some "'significant probative evidence tending to support the complaint'" must be produced. *Id.* (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968)); *see also Addisu*, 198 F.3d at 1134 ("A scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact.").

In adjudicating summary judgment motions, the court must view all evidence and inferences in the light most favorable to the nonmoving party. *T.W. Elec. Serv.*, 809 F.2d at 630-31. Inferences may be drawn from underlying facts not in dispute, as well as from disputed facts that the judge is required to resolve in favor of the nonmoving party. *Id.*

18

IV.        ANALYSIS.

        A.    The Takings Clause (Count I).

        "The Takings Clause of the Fifth Amendment, made applicable to the States through the Fourteenth, provides that private property shall not 'be taken for public use, without just compensation.'" *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 536-37 (2005) (citing *Chicago, B. & Q.R. Co. v. Chicago*, 166 U.S. 226 (1897)).  The Takings Clause "does not prohibit the taking of private property, but instead places a condition on the exercise of that power." *First English Evangelical Lutheran Church of Glendale v. Cnty. of Los Angeles*, 482 U.S. 304, 314 (1987).  The Takings Clause "is designed not to limit the governmental interference with property rights per se, but rather to secure compensation in the event of otherwise proper interference amounting to a taking." *Id.* at 315.

        Prior to *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393 (1922), "the Takings Clause was understood to provide protection only against a direct appropriation of property--personal or real." *Horne v. Dep't of Agric.*, 576 U.S. 350, 360 (2015). "Beginning with *Mahon*, however, the Court recognized that government regulation of private property may, in some instances, be so onerous that its effect is tantamount to a direct appropriation or ouster—and that such 'regulatory takings' may be compensable under the Fifth Amendment" if the

19

"'regulation goes too far.'"  *Lingle*, 544 U.S. at 537 (quoting *Mahon*, 260 U.S. at 415).

The present case involves a specific type of regulatory taking: a "retrospective temporary regulatory taking."  *See generally Bridge Aina Le'a, LLC v. Hawaii Land Use Comm'n*, 2018 WL 3149489, at *10 (D. Haw. June 27, 2018).  In such a case, the government enacts a regulation that diminishes the value of the property at issue, but the regulation is "'ultimately invalidated by the courts.'"  *Id.* (*quoting First English*, 482 U.S. at 310.

To prevail on its claim for a temporary regulatory taking, DW must establish (1) "that [it] possess[ed] a constitutionally protected property interest," *Flint v. Cty. of Kauai*, 521 F. Supp. 3d 978, 988 (D. Haw. 2021) (citing *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1000 (1984)), and (2) that the "interference with [its] property [was] of such a magnitude" that it constituted a taking.  *Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104, 136 (1978); *see also Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 321 (2002); *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1015-16 (1992).

In this motion, the first element[6] is at issue.
"Generally speaking, for the purposes of the Takings Clause,
"state law defines property interests.'" *Flint,* 521 F. Supp. 3d
at 988 (quoting *Stop the Beach Renourishment, Inc. v. Florida
Dept. of Env't Protection*, 560 U.S. 702, 707 (2010)).
Defendants argue that, under Hawaii law, DW did not have a
constitutionally protected property interest that was taken by
the Reversion Order.

In response, DW contends that it can bring a Takings
Clause claim based on three separate interests: (1) its
contractual right to develop the Residential Property under a
joint development agreement, ECF No. 78, PageID # 1909; (2) its
right to possess the Residential Property, *id.* at 1908-13; and
(3) its leasehold interest in the Ouli Wells. *Id.* at 1910,
1912. To the extent DW's claims are based on the first and
third interests, Defendants are entitled to summary judgment.
Questions of material fact, however, preclude summary judgment
on DW's claims based on its alleged right to possess the
Residential Property.

---

[6] Defendants frame this as a question of standing. They contend
that because DW did not have a constitutionally protected
property interest, it did not have standing to sue. *See* ECF No.
71-1, PageID # 526. Their argument, however, focuses on whether
DW had a property interest that is protected by the Takings
Clause. *See id.* at 527-31. Irrespective of whether the issue
is viewed through the lens of standing or the first element of a
Takings Clause claim, the analysis is the same.

21

**B.     To the Extent DW's Takings Claim is Based on its Contract Right to Develop the Residential Property, Defendants are Entitled to Summary Judgment.**

DW first appears to argue that the Reversion Order interfered with its contractual right to develop the Residential Property.  *See* ECF No. 78, PageID # 1909 ("DW remained the master developer in the project, which vested property rights as set forth in a joint development agreement[.]"); *see also id.* at 1908 ("A contract may create a property interest under a takings claim.").  To the extent Count I is based on DW's contract rights, Defendants are entitled to summary judgment. The Takings Clause does not protect the value of those rights. *Omnia Commercial Co. v. United States*, 261 U.S. 502 (1923).

In *Omnia*, the plaintiff had acquired "the right to purchase a large quantity of steel plate . . . at a price under the market."  261 U.S. at 507.  Before it completed that transaction, World War I intervened, and the "United States government requisitioned the [selling company's] entire production of steel plate for the year 1918."  *Id.*  The plaintiff therefore did not receive the steel it was entitled to under the contract.  *Id.*  It sued, arguing that, by rendering the performance of the contract impossible, the government had "taken" its right to the steel and was required to pay just compensation under the Fifth Amendment.  *Id.* at 508.

The Supreme Court agreed that contracts can be property for the purposes of the Fifth Amendment. *Id.* at 508. It held, however, that the Takings Clause does not apply when the government interferes with one party's performance under a contract without directly taking over the contract:

> There are many laws and governmental operations which injuriously affect the value of or destroy property . . . but for which no remedy is afforded.  Contracts in this respect do not differ from other kinds of property.
>
> . . . .
>
> [F]or *consequential loss or injury resulting from lawful governmental action the law affords no remedy*.  The character of the power exercised is not material.  If, under any power, a contract or other property is *taken* for public use, the government is liable, but, if injured or destroyed by lawful action, without a taking, the government is not liable. . . .
>
> In exercising the power to requisition, the government dealt only with the steel company, which company thereupon became liable to deliver its product to the government, by virtue of the statute and in response to the order.  *As a result of this lawful governmental action the performance of the contract was rendered impossible. It was not appropriated, but ended*.

*Id.* at 509-11.

This court recognizes that, at times, *Omnia* relied on outdated premises.  For instance, the Court appeared to assert that only a direct appropriation constitutes a taking.  *See id.*

23

at 509-10 (citing, *inter alia*, *Legal Tender Cases*, 12 Wall. 457 (1870)).  That is no longer the law.  *See Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2071 (2021) (recognizing that decisions such as *Legal Tender Cases* have been abrogated).  Since *Omnia* was decided, the Supreme Court has explained that regulatory interference with property rights can also constitute a taking. *See id.* at 2071-72; *see also Perry Cap. LLC v. Lew*, 70 F. Supp. 3d 208, 246 n.58 (D.D.C. 2014) (declining to rely on *Omnia* as an alternate basis for dismissal because *Omnia* was decided "just five months after the concept of a regulatory taking was born, and many decades before the Supreme Court began actively developing its regulatory takings jurisprudence").

But *Omnia*'s core holding——that the government does not "take" property rights by interfering with one party's performance under a contract——remains good law.  In *Omnia*, the Court reasoned that (1) any damages arising out of such interference are consequential, and (2) consequential damages are not recoverable under the Fifth Amendment.  261 U.S. at 510-11.  That reasoning still applies today.  *See United States v. 50 Acres of Land*, 469 U.S. 24, 33 (1984) ("[T]he Fifth Amendment does not require any award for consequential damages arising from a condemnation."); *United States v. Gen. Motors Corp.*, 323 U.S. 373, 380 (1945) ("that which is taken or damaged is the group of rights which the so-called owner exercises in his

24

dominion of the physical thing, and that damage to those rights of ownership does not include losses to his business or other consequential damage").

Moreover, the Supreme Court has never reconsidered *Omnia*.  In its Takings Clause jurisprudence, the Court has reasoned that "'Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law.'" *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978) (quoting *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 413 (1922)).  By not reexamining *Omnia*, the Court has implicitly recognized that regulation would become impossible if the government became liable for the losses suffered by every party to a contract affected by a specific regulation.

Finally, appellate decisions continue to rely on *Omnia*.  *See, e.g.*, *Palmyra Pac. Seafoods, L.L.C. v. United States*, 561 F.3d 1361, 1365 (Fed. Cir. 2009) ("As a general matter, the government does not 'take' contract rights pertaining to a contract between two private parties simply by engaging in lawful action that affects the value of one of the parties' contract rights.").  This court therefore concludes that it continues to be bound by the core holding of *Omnia*.  To the extent DW is attempting to pursue a Takings Clause claim based on the assertion that the Reversion Order interfered with

its contract rights by making it impossible to develop the Residential Property, that claim is precluded by *Omnia*. *See Palmyra*, 561 F.3d 1361 (affirming decision dismissing a similar claim); *Huntleigh USA Corp. v. United States*, 525 F.3d 1370, 1382 (Fed. Cir. 2008) (holding that "*Omnia* foreclosed the existence of a compensable taking" under similar circumstances).

> **C.   To the Extent DW's Takings Claim is Based on its Alleged Right to Possess the Residential Property, Questions of Material Fact Preclude Summary Judgment.**

DW also contends that it has a viable Takings Clause claim because it had "possessory rights" in the Residential Property.  ECF No. 78, PageID # 1908.  That assertion raises questions of material fact.

Under the First Agreement, DW was the buyer of the Residential Property.  Hawaii law generally recognizes that purchasers of real property hold rights protected by the Takings Clause.  Once an agreement to sell real property is signed, Hawaii law treats the purchaser as the owner of the property. *Bank of Hawaii v. Horwoth*, 71 Haw. 204, 211, 787 P.2d 674, 679 (1990). "[S]o far as the interest or estate in the land of the two parties is concerned, a purchase contract operates to transfer the estate from the seller and to vest it in the purchaser." *Id.* (quotation marks and brackets omitted).  The purchaser "is looked upon and treated as *the owner of the land*"

26

while the seller's "beneficial interest in the land is gone, and only the naked legal title remains." *Id.* at 212 n.8, 787 P.2d at 679 n.8 (emphasis in original); *see also Jenkins v. Wise*, 58 Haw. 592, 596, 574 P.2d 1337, 1340 (1978) ("The purchaser becomes vested with the equitable and beneficial ownership of the property.").

Courts addressing similar rules in other jurisdictions have concluded that the purchaser, not the seller, should be treated as the owner of the property for the purposes of the Takings Clause. *See, e.g.*, *Cooley v. United States*, 46 Fed. Cl. 538, 546 (2000) (applying Minnesota law and concluding that "plaintiffs' 'contract for deed' constituted ownership of the land for purposes of plaintiffs' Fifth Amendment taking claim"), *aff'd in part, vacated in part on other grounds*, 324 F.3d 1297 (Fed. Cir. 2003); *see also Ferrif v. City of Hot Springs*, 82 F.3d 229, 231 (8th Cir. 1996) (applying Arkansas law and reaching a similar conclusion in a case under the due process clause). That conclusion makes sense. In a case involving a regulatory taking, "[t]he owner's loss is measured by the extent to which" the taking reduces the "overall fair market value of the affected property." *Wheeler v. City of Pleasant Grove*, 833 F.2d 267, 270 (11th Cir. 1987); *see also Bridge Aina Le'a, LLC v. Land Use Comm'n*, 950 F.3d 610, 632 n.12 (9th Cir. 2020) (adopting *Wheeler*). Once an agreement of sale is executed, *the*

27

*buyer is the party who is affected by a diminution in the property's fair market value*.  The buyer has already agreed to buy the property at a price that is now too high,[7] and, conversely, the seller is entitled to receive an amount that is based on the property's value before the regulation was enacted. If the seller, not the buyer, was entitled to bring a Takings Claim, the seller could recover twice.  The seller would be entitled to both the full purchase price *and* damages under the Takings Clause, while the buyer, who substantially overpaid for the property, would have no recourse.  The Fifth Amendment does not require such a perverse result.

Defendants, citing *Omnia*, appear to disagree.  *See* ECF No. 71-1, PageID # 529-30.  In *Omnia*, the Supreme Court held that the government does not take property when it interferes with a party's ability to complete that contract.  261 U.S. at 509-11.  The Court did not address a reduction in the value of an item that was purchased, and it certainly did not address the

---

[7] The court's analysis would be affected if the regulatory taking permitted the buyer to cancel the contract.  Here, DW had the right to cancel the First Agreement in the event of a taking exceeding $500,000, *see* ECF No. 72-11, PageID # 832, but DW did not exercise that right.  Moreover, at the time the Land Use Commission issued the Reversion Order, it would have been difficult for DW to determine the value of the taking (if one occurred), because it could not have known how long the appeal of the Reversion Order would last.  At the summary judgment stage, this court cannot conclude that DW *knew* that the value of the taking exceeded $500,000.

purchase or sale of real property.  Under Hawaii law, the purchaser of real property under an agreement of sale is treated as the owner of the property even before a sale closes.  This court does not here extend *Omnia* to cases involving a regulatory taking of that interest.  *Omnia* relied on abrogated decisions that rejected even the possibility of a regulatory taking.

Defendants also maintain that this case is distinguishable because DW only had an "option" to purchase the property.  *See* ECF No. 80, PageID # 2410.  An option contract is one that "imposes no obligation to purchase upon the person to whom it is given."  *Matter of Estate of Damon*, 5 Haw. App. 304, 311, 689 P.2d 204, 208 (1984); *see also In re Continental Properties, Inc.*, 15 B.R. 732 (D. Haw. Bankr. 1981) (deeming a contract to be an option contract because "the Debtor is not under any duty to perform").  This case does not involve an option contract.

At a hearing on this matter, Defendants maintained that certain language in section 3.A(5) of the First Agreement created a purchase option.[8]  When combined with the introductory

---

[8] Defendants also claimed that a subsequent agreement between Bridge and DW referred to the First Agreement as an option contract.  ECF No, 72-28, PageID # 1152.  That document referred to a *2007* option to purchase certain property.  The document also discusses the First Agreement, which was signed in *2009*, and describes it as an "installment *purchase contract*."  *Id.* (emphasis added).

29

language in section 3.A, section 3.A(5) states that DW "*shall pay* [Bridge] a Purchase Price of [$40,700,000] . . . when and as follows and in the following amounts: . . . (5) On and as of the Residential Property Closing Date, [$15,000,000.]"  ECF No. 72-11, PageID # 823-24 (emphasis added).  If DW failed to honor that obligation, Bridge had the right to sue for specific performance.  *Id.* at 834.  DW's performance was not optional.

In addition, Defendants cited the Hawaii Supreme Court's decision in *Kepo'o v. Kane*, 106 Hawaii 270, 103 P.3d 939 (2005), for the proposition that *any* condition precedent in a purchase contract transforms that contract into an option contract.  Defendants misinterpret *Kepo'o.*  In that case, the State's Department of Hawaiian Home Lands leased certain property to Waimana Enterprises, Inc., to construct a power plant.  *Id.* at 274-75, 103 P.3d at 943-44.  The state trial court ruled that the lease was "void at its inception" because DHHL had issued the lease without the Environmental Impact Statement required by Haw. Rev. Stat. § 343-5(c).  *See id.* at 292, 103 P.3d at 961 (affirming the trial court's conclusion).  On appeal, Waimana argued that the trial court's decision to void the lease constituted a taking.  *Id.* at 281, 103 P.3d at 950.

The Hawaii Supreme Court disagreed.  It explained:

> Even though the court voided Lease No. 242
> almost six years after it was executed . . .
> Waimana did not acquire a vested interest in
> the lease because it was not preceded by the
> requisite environmental study, which, in
> Hawai'i, is a condition precedent to
> approval of the request and commencement of
> proposed action . . . . *Because the [DHHL's
> decision], upon which Lease No. 242 was
> based, did not comport with chapter 343*, *the
> lease was void and no rights could have
> vested*[.]

*Id.* at 295, 103 P.3d at 964 (emphasis added).  In short, *Kepo'o*

held that the state agency's failure to comply with a *statutory*

condition precedent rendered the lease illegal and therefore

void, which precluded the lessee from bringing a takings claim.

*Kepo'o* did not discuss option contracts at all.  Nothing in

*Kepo'o* suggests that the existence of a condition precedent in a

contract categorically defeats a Takings Clause claim.

In any event, DW's right to purchase the Residential

Property is not the most important right at issue.  Any

agreement to sell real property at some future date involves two

distinct rights: (1) the right to take title to the land after

the closing, and (2) the right to possess the property prior to

the closing.  *Cf. Jenkins*, 58 Haw. at 596, 574 P.2d at 1341

(noting that unless an agreement of sale provides otherwise, the

buyer is entitled to immediate possession of the property).  The

real right at issue in this case is the right to possess the

Residential Property before the First Agreement closed.

The distinction between the two rights is easiest to illustrate with an example. Consider an agreement involving the sale of an office building whose tenants pay $100,000 in rent each month. Assume that the buyer agrees to pay $10 million for the property, and that the closing date is set for 10 months after the agreement is signed. Also assume that the buyer retains the right to possess the property, and collect rent, until the closing date. If a subsequent regulation inhibits the owner's ability to collect rent from the tenants, the buyer's property interest has been harmed. The buyer has agreed to pay $10 million for a property that is now worth much less. But the seller also legitimately expected to collect $1 million in rent in the ten months before closing. That interest[9] has *also* been affected by the regulation at issue. Under those circumstances, both parties may have property interests that are taken.

The distinction between the right to take title after closing and the right to possess before closing is particularly important in cases involving temporary regulatory takings. In such cases, the only thing that is taken is "the property's potential for producing income or an expected profit." *Wheeler*,

---

[9] As discussed in greater detail below, the right to possess the property before the closing is effectively a lease. Leases are protected by the Takings Clause. *See generally United States v. Petty Motor Co.*, 327 U.S. 372, 374-75 (1946); *United States v. Gen. Motors Corp.*, 323 U.S. 373, 377-78 (1945).

833 F.2d at 271.  If a temporary regulation is only in effect before an agreement to sell real property closes, then the only property interest that is affected is the right to use the land to produce a profit before the closing.  To return to the preceding example, if the regulation prohibiting the collection of rent had only been in effect before the sale closed, only the owner's interest in collecting rent during the interim 10-month period would have been affected.

That is exactly what happened here.  Bridge agreed to sell the Residential Property to DW on February 9, 2009, when the parties signed the First Agreement.  ECF No. 72-11.  As of November 25, 2014, when the Hawaii Supreme Court affirmed the decision vacating the Reversion Order, the sale still had not closed.

The right affected, therefore, was the right to possess the property before the closing.  That right was addressed by the parties' contract.  According to the First Agreement, "for so long as Buyer is not in default of its obligations under this Agreement, and upon and subject to the terms and conditions of this Agreement, Seller shall deliver to Buyer exclusive possession of the Urban Land."  ECF No. 72-11, PageID # 831.  Thus, if it was not in default, DW had the right to use the Urban Land, which included the Residential Property, to produce a profit.

There is a genuine dispute of material fact as to whether DW was in default.  According to Wessels, although DW did not make the payments called for by the First Agreement, "the closing was extended within the parameters of the Agreement."  ECF No. 78-6.  That assertion is consistent with Aina Le'a's bankruptcy filings, which indicated that performance under the First Agreement was suspended until November 25, 2014.  ECF No. 78-5, PageID # 2277.  If DW was not in default, it had the right to possess the Residential Property on April 25, 2011, when the Land Use Commission entered the Reversion Order.  To the extent DW had the right to occupy the property, that right is recognized by Hawaii law and may serve as the basis for a Takings Clause claim.

Defendants, in a footnote, contend that DW's exclusive right to possess the Residential Property gave it a mere "license for access to the property."  ECF No. 80, PageID # 2411 n.1 (citing *Kiehm v. Adams*, 109 Hawaii 296, 126 P.3d 339 (2005)).  In *Kiehm*, the Hawaii Supreme Court held that a license is an agreement "for the permissive use" of the property at issue.  *Id.* at 302, 126 P.3d at 345.  "Whether an agreement is a license or lease depends on the intention of the parties as ascertained from the nature of the agreement."  *Id.*  There are three factors "that a court should consider in determining whether an agreement is a lease or license": (1) "[m]ost

34

importantly, does the grantee have the right to occupy a distinct and separate part of the premises"; (2) "[i]s the grantees' right to possession assignable (suggesting a lease)"; and (3) "is the agreement for a fixed term (suggesting a lease)." *Id.* at 303, 126 P.3d at 346.

In this case, the first and third factors strongly suggest that DW's interest was the functional equivalent of a lease. Under the first and most important factor, the First Agreement granted DW the exclusive right to possess the Residential Property. It is hard to see how the parties could have intended that DW have the mere right to permissively use the Residential Property when *DW* had the right to exclude *Bridge*. And under the third factor, the agreement was for a fixed term, specifically, the period until the First Agreement closed. At the very least, the issue of whether DW held an interest in the property that was more than a license raises questions of material fact.

Defendants also appear to maintain that the Reversion Order could not have "taken" any rights that DW had in the Residential Property because "DW entered the contract with full knowledge that the Commission might revert the property." ECF No. 71-1, PageID # 530; *see also* ECF No. 80, PageID # 2414. But the Hawaii Supreme Court held that the Reversion Order was

35

unlawful.  DW was not required to anticipate that the Land Use Commission would *illegally* revert the property.

In sum, the question of whether DW had an ownership interest in the Residential Property that would give it the right to bring a Takings Clause claim raises genuine issues of material fact.[10]  To the extent DW's claims in Count I are based on that interest, Defendants are not entitled to summary judgment.

The court emphasizes that the only question presently before it is whether DW possessed a property interest that the Takings Clause protects.  If DW had the right to possess the Residential Property, it had a protected interest.  On the merits, this court notes that any claim based on that interest would be identical to the claim that the Ninth Circuit concluded failed as a matter of law in the related case filed by Bridge. *See Bridge*, 950 F.3d at 625-37.  Defendants, however, have not yet filed a motion for summary judgment on that basis.

---

[10] For the same reasons, this court rejects Defendants' contention that DW is only entitled to nominal damages.  That assertion is based on the premise that DW did not have a property right that was affected by the Reversion Order. *See* ECF No. 71-1, PageID # 536 ("This is not a claim for just compensation of any property DW owned.").

      **D.**    **To the Extent DW's Takings Claim is Based on its Right to Lease the Ouli Wells, Defendants are Entitled to Summary Judgment.**

DW also appears to contend that it had a leasehold interest in the Ouli Wells that was taken by the Reversion Order.  *See* ECF No. 78, PageID # 1910-1913.  To the extent Count I is based on that leasehold interest, Defendants are entitled to summary judgment.

As an initial matter, the First Agreement obligated Bridge to lease the Ouli Wells to DW after "the first to occur (if any) of the following dates: (a) the second to occur of the Affordable Housing Parcel Closing Date and the Residential Property Closing Date; (b) the provision by [DW] . . . of [a performance and payment bond] . . . ;" or (c) the date DW chose to make an additional payment of $5 million to Bridge.  ECF No. 72-11, PageID # 829.  Defendants, citing public records, argue that none of those events occurred until November 17, 2015, and that Bridge issued the lease to Aina Le'a on that date.  ECF No. 81-2.  Defendants therefore maintain that DW did not receive a leasehold interest in the Ouli Wells at all, and certainly not before the Hawaii Supreme Court affirmed the decision vacating the Reversion Order.

Because Defendants raised that argument in their reply brief, this court permitted DW to file a supplemental submission attaching any documents that demonstrated that the Ouli Wells

lease vested before November 17, 2015.  In that submission, DW
cited a 2007 "Option and Purchase Agreement" that included an
*option* to purchase certain property "together with . . . a lease
of the Ouli Wells" from Bridge.  ECF No. 88-2, PageID # 2614.
However, DW has not cited any evidence showing that it exercised
the option and actually obtained the lease.  A subsequent
document discussing the 2007 Option and Purchase Agreement
states that because DW failed to fund the 2007 option contract,
the contract was cancelled.  ECF No. 72-28, PageID # 1152.
Indeed, it is hard to understand why the First Agreement, which
the parties signed in *2009*, would include an Ouli Wells lease if
DW had already obtained the lease in *2007*.  Accordingly, DW has
failed to rebut Defendants' evidence showing that the Ouli Wells
lease did not vest until November 17, 2015.  The uncontroverted
evidence therefore shows that DW did not receive a lease to the
property before the Reversion Order was vacated.

        In any event, *the Reversion Order did not affect the
Ouli Wells at all*.  That order reverted "approximately 1,060
acres of land consisting of Tax Map Key Nos.: 6-8-
01:025(portion); 036 (portion), 038 (portion), 039 (portion),
and 040 (portion)" to agricultural land.  ECF No. 72-22, PageID
# 1066.  The Ouli Wells, in contrast, are identified by "Tax Map
Key Numbers: 6-2-001: 087, 088, and 089."  ECF No. 72-11.  DW
cannot claim that its interest in the Ouli Wells was "taken" by

the Reversion Order when the wells were untouched by that order.
To the extent Count I is based on DW's purported interest in the
Ouli Wells, Defendants are entitled to summary judgment.

### E. Defendants are Entitled to Summary Judgment Because DW Has Failed to Establish its Standing.

In sum, the only viable Takings Clause claim DW might
have is a claim based on its right to possess the Residential
Property under the First Agreement.  Defendants, however,
contend that even if that claim is viable, they are still
entitled to summary judgment.  According to Defendants, DW
lacked standing when it initiated this action because, before
the action began, it assigned its takings claim to Aina Le'a.
*See* ECF No. 71-1, PageID # 531-33.  The court agrees that
Defendants are entitled to summary judgment on that basis.

As an initial matter, DW argues that Defendants waived
their challenge to DW's standing by failing to contest DW's
standing to challenge the Reversion Order in state court.
Defendants' argument, however, applies only to proceedings
before this court.  They only assert that DW assigned *the claims
at issue here* to Aina Le'a.  And, in any event, "[a]s a
jurisdictional requirement, [challenges to] standing to litigate
cannot be waived or forfeited."  *Virginia House of Delegates v.
Bethune-Hill*, 139 S. Ct. 1945, 1951 (2019).

As to the substance of this issue, the court begins
with three propositions that are not in dispute.  Most
importantly, Defendants argue that once a claim has been
assigned, the assignor lacks standing to sue on that claim.  *See*
ECF No. 71-1, PageID # 531-33; *see also In re WellPoint, Inc.
Out-of-Network UCR Rates Litig.*, 903 F. Supp. 2d 880, 897 (C.D.
Cal. 2012) ("Once a claim has been assigned . . . the assignee
is the owner and the assignor generally lacks standing to sue on
it.").  DW did not challenge that proposition.  *See* ECF No. 78,
PageID # 1905-13, 1920-21.  That decision was reasonable.
Standing doctrine ensures that the plaintiff has a "personal
stake in the outcome of the controversy." *Baker v. Carr*, 369
U.S. 186, 204 (1962).  A party who has assigned a claim away
does not have that personal stake.

In any event, this court need not consider that issue
further.  Because this court has "a *sua sponte* obligation
to ensure that it has subject matter jurisdiction over a case,"
*King v. Colvin*, 2013 WL 3388730, at *1 (N.D. Cal. July 8, 2013),
*challenges* to a plaintiff's standing can never be waived or
forfeited.  Once the plaintiff's standing is called into
question, however, it is the plaintiff who bears the ultimate
burden of proving its standing.  *Lujan v. Defs. of Wildlife*, 504
U.S. 555, 561 (1992).  A plaintiff can waive arguments
concerning its standing by failing to make them.  *See, e.g., NEI*

40

*Contracting & Eng'g, Inc. v. Hanson Aggregates Pac. Sw., Inc.*,
926 F.3d 528, 533 (9th Cir. 2019) ("Furthermore, by failing to
address its individual standing on appeal, NEI has waived the
right to challenge the district court's standing
determination."); *Huron v. Cobert*, 809 F.3d 1274, 1280 & n.4
(D.C. Cir. 2016) (plaintiff waived standing arguments by not
raising them before the district court).

        DW has therefore waived any reliance on cases such as
*Fund Liquidation Holdings LLC v. Bank of America Corp.*, 991 F.3d
370, 381 (2d Cir. 2021), or *Almos Hanu v. Y. Yamaichi*, 30 Haw.
959, 962 (Haw. Terr. 1929).  This court is not holding that any
arguments based on those cases would have succeeded.  DW has not
cited those cases, or the reasoning set forth in them, and this
court is under no obligation to articulate any rationale for DW.
It is not this court's role to make arguments for any party.
This court notes that both decisions predated the briefing on
this motion, and DW could have relied on them if it so chose.

        Two other points are not in dispute.  The parties
appear to agree that, on or before May 24, 2019, the date that
the bankruptcy court approved Aina Le'a's plan of
reorganization, DW had assigned its takings claims to Aina Le'a.
After all, the bankruptcy court's order specifically states that
Aina Le'a had the "exclusive" right to bring those claims.
There also is no dispute that standing "is measured from a

41

litigation's beginning." *Planned Parenthood of Greater Washington & N. Idaho v. U.S. Dep't of Health & Hum. Servs.*, 946 F.3d 1100, 1108 (9th Cir. 2020); *accord White v. Lee*, 227 F.3d 1214, 1243 (9th Cir. 2000) (holding that standing is examined at the commencement of the litigation).

On a motion for summary judgment, the moving party bears the initial burden of pointing to the portions of the record that it believes demonstrate the absence of any genuine issue of material fact. Based on those three uncontested propositions, Defendants satisfied their initial burden by pointing to the absence of any documents suggesting that DW assigned the claims at issue to Aina Le'a between February 23, 2017, when this action began, and May 24, 2019. *See, e.g.*, ECF No. 90, PageID # 2662 (asserting that DW "failed to produce documents . . . relating to DW assigning rights to Aina Le'a"). If there is no dispute that DW assigned the claims to Aina Le'a on or before May 24, 2019, and there are no documents suggesting that the assignment occurred after February 23, 2017, then it must have occurred before that date in 2017. That would mean that DW did not have standing to sue when it filed its complaint.

The burden therefore shifted to DW to establish a genuine issue for trial. DW's arguments concerning its standing are difficult to follow. This court discerns three possible

42

arguments that DW could be making: (1) DW had standing at the outset of the case because the assignment of the claims at issue in this action to Aina Le'a occurred after February 23, 2017, when this action began, (2) even if the assignment occurred before February 23, 2017, DW retained an interest in the outcome of this action, or (3) even if it lacked standing at the outset, the 2022 Assignment back to provided DW with standing.[11]  None of those assertions demonstrates the existence of a genuine issue of material fact that precludes the entry of summary judgment.

       **1.**    **DW has Failed to Come Forward with Evidence Suggesting that that the Initial Assignment Occurred After February 23, 2017.**

As an initial matter, DW has suggested that it did not assign its claims to Aina Le'a until after this action commenced.  Specifically, at a hearing, counsel for DW indicated that the assignment discussed in the bankruptcy court's order may have occurred at some point in 2017.  ECF No. 95, PageID # 2680-82.  However, counsel expressed uncertainty about the exact date, and counsel did not cite any evidence in support of that assertion.

---

[11] DW also appears to take the position that, at some point in time, the claims at issue were simultaneously assigned to both DW and Aina Le'a.  *See* ECF No. 102, PageID # 2743 ("Even though the claims were assigned to Aina, the officers of both DW and Aina orally agreed that DW would be assigned the right to continue the legal action against the State.").  That position is extremely difficult to understand, and, in any event, no evidence supports it.

To allow DW to clarify its position, this court permitted DW to file a supplemental brief identifying the exact date that it assigned this action to Aina Le'a, as indicated by the bankruptcy decree. *Id.* at 2699 ("I also want a date of any assignment referred to in the 2019 bankruptcy order . . . I want the date."); *see also id.* at 2700 ("I need whatever assignments are referred to in the 2019 bankruptcy order . . . give me dates."). DW failed to comply with that request, instead filing a "chronology of assignments" that discussed a 2009 assignment, a 2012 assignment, a 2015 assignment, the 2019 bankruptcy proceedings, a 2021 assignment, and a 2022 assignment. ECF No. 93, PageID # 2670-73. This court did not ask DW for a chronology of assignments. It asked DW to provide it with a single date: the date the assignment referenced in the bankruptcy order occurred. DW failed to answer that specific inquiry.

The record clearly reflects that, on or before May 24, 2019, DW assigned the claims at issue in this case to Aina Le'a. Despite multiple requests from this court, DW has not stated when that assignment occurred. If anyone has that information, DW must have it. It has to know when it transferred any claims it had to another entity. This court can only construe DW's failure to provide a clear answer as an admission that, when the case began, it had already assigned its claims to Aina Le'a.

44

Put another way, because Defendants satisfied their initial burden, the burden shifted to DW to identify some evidence in the record establishing its standing.  DW cannot even articulate when the initial assignment to Aina Le'a occurred.  It therefore cannot defeat Defendants' motion for summary judgment by arguing that the assignment occurred before February 23, 2017, when this action began.

> **2.  DW Has Failed to Come Forward with Evidence That it Retained an Interest in the Outcome of this Action.**

DW also appears to argue that, even if it did assign its claims to Aina Le'a, it has standing to sue because it "retained the right to collect the first $17 million" recovered by Aina Le'a in this action.  ECF No. 78, PageID # 1920-21; *see also* ECF No. 88, PageID # 2610 ("DW can maintain its lawsuit in this case but would be required to turn over any proceeds beyond $17 million to Aina Le'a.").  Nothing in the record supports that right.  The only documents clearly discussing the assignment of the claims at issue, the bankruptcy decree and the 2022 Assignment, refer to DW's assignment of the entire claim.  ECF No. 72-39, PageID # 1667; ECF No. 88-5, PageID # 2653-54.  Neither document discusses DW's retention of the right to receive the first $17 million in damages.

DW appears to be maintaining that its right to collect the first $17 million in damages arises out of the 2012

Assignment.  For instance, in its opposition, DW maintains that
that right is discussed in a litigation note in one of Aina
Le'a's bankruptcy disclosures.  ECF No. 78, PageID # 1920.  The
litigation note repeats the terms of the 2012 Assignment.  ECF
No. 78-5, PageID # 2277.  DW also submitted a declaration from
Robert Wessels, a DW executive, that asserts that the right to
the first $17 million was "preserved by agreement."  ECF No. 78-
6, PageID # 2385.  Wessels does not identify the agreement that
"preserved" these rights.  The only agreement in the record that
includes a $17 million figure is the 2012 Assignment.  It
therefore appears that Wessels is referring to the 2012
Assignment.

　　　　The 2012 Assignment did not have the effect that DW
claims.  In the 2012 Assignment, DW gave Aina Le'a the right to
purchase the Residential Property[12] in return for an "unsecured
note" that was to "be paid by the proceeds of future parcel
resales" from the Residential Property.  ECF No. 72-23, PageID #
1072.  In other words, the only right Aina Le'a granted DW in
the 2012 Assignment was the right to collect the first $17

---

[12]  The assignment of the right to purchase the Residential
Property did not operate as an assignment of legal claims at
issue here.  If a homeowner who was exposed to asbestos later
sells her house, she plainly does not transfer her legal claims
based on her asbestos exposure just because she sold the house
itself.  Similarly, DW did not necessarily lose takings claims
that had already accrued just because it sold its right to
purchase the Residential Property.

million in income generated by Aina Leʻaʻs sales of parcels from the Residential Property.  At most, the 2012 Assignment made DW one of Aina Leʻaʻs general creditors.  DW has not cited any authority suggesting that general creditors have standing to assert claims owned by their debtors.  *See Blue Cross of California v. Sonoma W. Med. Ctr., Inc.*, 2019 WL 926329, at *6 (C.D. Cal. Feb. 7, 2019) ("In essence, Defendants claim that they have suffered injury in fact because they are creditors . . . . But the injury in fact test requires more than injury to a cognizable interest.  It requires that the party seeking review be himself among the injured." (internal quotation marks omitted)).

Allowing DW to bring a claim owned by Aina Leʻa would cause particular problems in this case, because Aina Leʻa recently exited bankruptcy.  Under the plan approved by the bankruptcy court, Aina Leʻa owes money to numerous creditors.  *See generally* ECF No. 72-39.  Aina Leʻaʻs $17 million debt to DW was not even mentioned in the bankruptcy plan.  Allowing DW to stand in the shoes of Aina Leʻa would effectively allow DW to jump in front of other creditors by recovering funds that those creditors may have a right to.

In sum, DW has not shown that it retained any interest in this action following the assignment of the claims at issue

47

here.  DW has not created a genuine issue of material fact concerning its standing by pointing to the 2012 Assignment.

### 3.  Aina Leʻaʼs 2022 Assignment Back to DW Does Not Cure DWʼs Lack of Standing.

Finally, DW appears to argue that even if it lacked standing at the beginning of this case, the Assignment signed on March 9, 2022, "should be deemed sufficient to establish standing for DW to maintain the lawsuit on behalf of [Aina Leʻa]."  ECF No. 102, PageID # 2744.  Of course, when this case began, the 2022 Assignment was not yet in effect.  "The existence of federal jurisdiction ordinarily depends on the facts as they exist when the complaint is filed."  *Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 830 (1989).  Because DW lacked standing at the outset, Defendants are entitled to summary judgment.  *See Lierboe v. State Farm Mut. Auto. Ins. Co.*, 350 F.3d 1018 (9th Cir. 2003).

The reasoning in *Lierboe* is instructive, although it is not clear that the case is governing.  In *Lierboe*, the Ninth Circuit held that the sole named plaintiff in a class action did not have standing to sue.  *Id.* at 1023.  That defect doomed the entire action.  Because the named plaintiff "never had standing," the suit could not proceed by substituting a different class member as the named plaintiff.  *Id.*  The named plaintiffʼs lack of standing required the dismissal of the

48

entire case.  *Id.; see also Hajro v. United States Citizenship & Immigr. Servs.*, 743 F. App'x 148, 150 (9th Cir. 2018) (holding that a plaintiff who lacked standing could not amend the complaint to add new parties but also noting that *Lierboe* was distinguishable from a case involving individual plaintiffs).

Under *Lierboe*, DW cannot avoid summary judgment by citing the 2022 Assignment.  *Lierboe* held that one plaintiff's lack of standing cannot be cured through the substitution of a new plaintiff with standing.  *Id.*  Thus, if DW lacked standing because it assigned its claims to Aina Le'a before it filed suit, it could not have later cured that defect by substituting Aina Le'a as a plaintiff.  It would not make sense to allow DW and Aina Le'a to evade that rule by simply assigning the claims at issue in this action back to DW.

Of course, the rule that standing is determined based on the facts in existence at the beginning of the case "is susceptible to exceptions."  *Newman-Green*, 490 U.S. at 830.  But DW, the party with the burden of establishing its standing, has not cited any of those exceptions.

This court notes that there appears to be some tension between *Lierboe* and the Ninth Circuit's subsequent decision in *Northstar Financial Advisors Inc. v. Schwab Investments*, 779 F.3d 1036 (9th Cir. 2015).  In *Northstar*, the plaintiff, an asset manager, lacked standing to bring claims on behalf of the

49

investors of the mutual fund that it managed because it did not own any shares of the fund. *Id.* at 1043. After the action was filed, the plaintiff obtained an assignment of a claim from one of the investors in the fund. *Id.* The district court granted a motion to dismiss, because the plaintiff did not have standing when the case was filed. *Id.* However, the district court permitted the plaintiff to continue to prosecute the action by filing a supplemental complaint under Ruled 15(d) of the Federal Rules of Civil Procedure that included allegations that it had received an assignment of the claim from an investor. *See id.* The Ninth Circuit affirmed that procedure. It held that the rule that subject matter jurisdiction must exist at the start of a case "does not extend to supplemental pleadings filed pursuant to [Rule 15(d)]." *Id.* at 1046.

DW has never maintained that *Northstar* applies to this case. And even if it had, this court would have rejected that argument. As an initial matter, this case involves a motion for summary judgment, not a motion to dismiss. Moreover, DW has not sought to file a supplemental pleading under Rule 15(d).

Even if DW had sought leave to file a supplemental pleading, this court would have rejected that request. "The legal standard for granting or denying a motion to supplement under Rule 15(d) is the same as for amending one under 15(a)." *Lyon v. U.S. Immigr. & Customs Enf't*, 308 F.R.D. 203, 214 (N.D.

Cal. 2015) (internal quotation marks omitted).  "When a [Rule 15(d)] motion requires by implication the modification of the scheduling order, however, the movant must first satisfy the 'good cause' standard established by Rule 16(b)."  *Desio v. State Farm Mut. Auto. Ins. Co.*, 339 F.R.D. 632, 638 (D. Nev. 2021); *see also DRK Photo v. McGraw-Hill Glob. Educ. Holdings, LLC*, 870 F.3d 978, 989 (9th Cir. 2017).  "The central inquiry under Fed. R. Civ. P. 16(b)(4) is whether the requesting party was diligent in seeking the amendment.  *DRK Photo*, 870 F.3d at 989.  If the party seeking to modify the scheduling order was not diligent, "the inquiry should end."  *In re W. States Wholesale Nat. Gas Antitrust Litig.*, 715 F.3d 716, 737 (9th Cir. 2013) (internal quotation marks omitted).  The question of diligence falls within the district court's discretion.  *Id.*

Because the deadline for amending the pleadings has now passed, *see* ECF No. 68, DW would need to establish good cause before being allowed to file a supplemental pleading under Rule 15(d).  DW could not show good cause.  At the very least, it should have been apparent to DW that it lacked standing when the bankruptcy court approved the reorganization plan on May 24, 2019.  DW has stated that it believed that it had standing because the state did not contest its standing in the 2011 action challenging the validity of the Reversion Order, ECF No. 76-1, PageID # 1858-59; ECF No. 87, PageID # 2603-2064, but the

bankruptcy decree specifically stated that Aina Le'a had the exclusive right to bring the claims in *this action.* DW therefore should have known that its standing in this case was in doubt. And yet, DW failed to act. Aina Le'a did not assign the claims in this action back to DW until March 9, 2022, nearly three years later.[13] This is not diligence in attempting to remedy the standing defect. *See Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir. 1992) ("carelessness is not compatible with a finding of diligence and offers no reason for a grant of relief").

In addition to failing to exercise diligence, DW, upon having its standing questioned, submitted an assignment dated January 29, 2021. When this court asked DW why it had not produced that assignment earlier, counsel for DW responded that DW's officers had been unable to locate it because they had to go through "box files." ECF No. 95, PageID # 2688. Only after this court stated that it was considering requiring DW's officers to testify in court concerning the authenticity of the document, and that further discovery into the document's

---

[13] DW has discussed an earlier, oral assignment, but there is no evidence of such an assignment in the record. And, in any event, under Hawaii law assignments of claims must be in writing. *See* Haw. Rev. Stat. § 634-1 ("The assignee of any nonnegotiable chose in action, assigned in writing, may maintain thereon in the assignee's own name any action which, but for the assignment, might be maintained by the assignor[.]").

creation might be appropriate, did DW admit that the document had not actually been created until March 2022. *See* ECF No. 93, PageID # 2673. The 2021 date on the document is therefore misleading. Given the circumstances, even if DW had sought leave under Rule 15(d) to supplement its pleading, this court would not have exercised its discretion to allow a supplemental pleading. *Northstar*, which rests on a supplemental pleading, is therefore not applicable here.

In sum, DW has failed to point to any evidence showing that it had standing at the beginning of this case. Aina Le'a's subsequent assignment back to DW cannot cure DW's lack of standing. *Lierboe*, 350 F.3d at 1023. Because DW's lack of standing deprives this court of subject matter jurisdiction, Defendant's motion for summary judgment is granted.

> ### F. Defendants are Entitled to Summary Judgment on Count II.

Defendants also contend that, even if DW has standing, they are entitled to summary judgment on Count II, in which DW seeks attorneys' fees under 42 U.S.C. § 1988. According to Defendants, DW cannot seek attorneys' fees under § 1988 because Defendants are not "persons for the purposes of 42 U.S.C. § 1983. ECF No. 71-1, PageID # 537. DW did not respond to that argument in its opposition, and this court has already held that Defendants are not "persons" under 42 U.S.C. § 1983. *DW Aina*

*Le'a Dev., LLC v. Hawaii, Land Use Comm'n*, 2017 WL 2563226, at *6 (D. Haw. June 13, 2017).  More importantly, as DW lacks standing, it cannot recover fees in this action.

> **G.   Defendants' Motion to Amend the Complaint to Add Aina Le'a as a Plaintiff is Denied.**

Finally, DW has filed a separate motion seeking leave to amend the Complaint to add Aina Le'a as a party.  That motion is denied.  It is now clear that by March 9, 2022, Aina Le'a had assigned whatever interest it had in this action back to DW. *See* ECF No. 93, PageID # 2673.  Because Aina Le'a no longer has an interest in the outcome of this action, it is not entitled to be joined as a party.  DW's motion to amend is denied.

**V.      CONCLUSION.**

Defendants' motion for summary judgment is granted. Plaintiff's motion for leave to amend is denied.  Judgment to be entered in favor of Defendants.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, May 25, 2022.



/s/ Susan Oki Mollway

Susan Oki Mollway
United States District Judge

*DW Aina Le'a Development, LLC v. State of Hawaii, Land Use Commission; State of Hawaii and DOE Governmental Units 1-10*, Civ. No. 17-00113 SOM-WRP; Order Granting Defendants' Motion for Summary Judgment and Denying Plaintiff's Motion for Leave to Amend.