IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| DW AINA LE`A DEVELOPMENT, LLC, | ) ) ) | Civil NO. 17-00113 SOM-WRP |
| Plaintiff, | ) ) ) | ORDER GRANTING MOTIONS IN LIMINE NOS. 6, 8, 9, 11, 12, 16; ORDER DENYING MOTIONS IN |
| vs. | ) ) | LIMINE NOS. 2, 10, 13, AND 14; ORDER GRANTING IN PART |
| STATE OF HAWAII, LAND USE COMMISSION; STATE OF HAWAII; and DOE GOVERNMENTAL UNITS 1-10, | ) ) ) ) ) | AND DENYING IN PART MOTIONS IN LIMINE NOS. 3, 4, 5, AND 7; ORDER POSTPONING RULING ON MOTION IN LIMINE NO. 15 UNTIL |
| Defendants. | ) ) ) | A FURTHER MEET AND CONFER OCCURS WITH RESPECT TO IT |
| _____ | ) | |

**ORDER GRANTING MOTIONS IN LIMINE NOS. 6, 8, 9, 11, 12, 16; ORDER
DENYING MOTIONS IN LIMINE NOS. 2, 10, 13, AND 14; ORDER
GRANTING IN PART AND DENYING IN PART MOTIONS IN LIMINE NOS. 3, 4,
5, AND 7; ORDER POSTPONING RULING ON MOTION IN LIMINE NO. 15
UNTIL A FURTHER MEET AND CONFER OCCURS WITH RESPECT TO IT**

**I.       BACKGROUND RELEVANT TO THE MOTIONS IN LIMINE.**

The only claim remaining in this case is a temporary

regulatory takings claim asserted by Plaintiff DW Aina Le`a

Development, LLC, against Defendants State of Hawaii Land Use

Commission ("LUC") and the State of Hawaii (collectively,

"Hawaii").  Before turning to the fifteen motions in limine that

are the subject of this order, this court details that remaining

claim and the proper measure of damages for it.

The Ninth Circuit has already addressed a similar

temporary regulatory takings claim brought by another party

arising from the very same facts.  In *Bridge Aina Le`a, LLC v.

State of Hawaii Land Use Commission*, 950 F.3d 610, 632 (9th Cir.

2020), the Ninth Circuit ruled that the relevant takings period began with the LUC's written order of April 25, 2011, which reverted the property from urban to agricultural use, not the LUC's oral vote two years earlier, on April 30, 2009. *Id.* ("The reversion lasted roughly a year, from the Reversion Order's issuance in April 2011 until the Hawaii state circuit court's judgment vacating the order in June 2012.").  At the hearing on the motions in limine, DW agreed that the relevant takings period in this case began with the LUC's written order of April 25, 2009.  DW argued, however, that the takings period should end on the date the Hawaii Supreme Court affirmed the trial court.  For purposes of adjudicating these motions in limine, whether the takings period ended with the state circuit court's ruling or the Hawaii Supreme Court decision does not matter.

In an earlier summary judgment motion filed in this very case, Hawaii argued that no constitutionally protected property interest was taken from DW.  In response, DW identified three separate property interests that it claimed had been taken: 1) a contractual right to develop the residential property under a joint development agreement; 2) a leasehold interest in the Ouli Wells; and 3) a right to possess the residential property. *See DW Aina Le`a Development, LLC, V. State of Hawaii, Land Use Commission*, et al., 2022 WL 1665311, at *8 (D. Haw. May 5, 2022).

2

This court ruled that two of those three asserted interests were not sustainable.  To the extent DW's takings claim was based on a contractual right to develop the residential property under a joint development agreement, the court ruled that the Takings Clause did not protect those rights.  *See id.* at *8-*10.  This court also ruled that the LUC's reversion order had not affected any rights relating to the Ouli Wells, so no takings claim relating to the wells could proceed.  *See id.*, at *13-*14. With respect to a temporary regulatory taking of the right to possess property before the sale of the property to DW had closed, this court ruled that the real right in issue was the right to possess the residential property before the First Agreement had closed, and that "the only property interest that is affected is the right to use the land to produce a profit before the closing."  *Id.* at *12.

DW took an appeal that did not challenge this court's rulings rejecting two of DW's asserted property interests.  Those two rejected rights are therefore not now part of this case.  *See Ortega v. O'Connor*, 50 F.3d 778, 780 (9th Cir. 1995) (holding that an issue decided by a district court but not raised as error on appeal may not be challenged on remand); *see also JGR, Inc. v. Thomasville Furniture Indus., Inc.*, 550 F.3d 529, 532 (6th Cir. 2008) ("A party that fails to appeal an issue waives his right to raise the issue before the district court on remand or before

this court on appeal after remand.  The law-of-the case doctrine bars challenges to a decision made at a previous stage of litigation which could have been challenged in a prior appeal, but were not."  (alterations, quotation marks, and citation omitted)); *United States v. Escobar-Urrego*, 110 F.3d 1556, 1560 (11th Cir. 1997) ("'Under the law of the case doctrine, a legal decision made at one stage of the litigation, unchallenged in a subsequent appeal when the opportunity existed, becomes the law of the case for future stages of the same litigation, and the parties are deemed to have waived the right to challenge that decision at a later time.'" (quoting *Williamsburg Wax Museum v. Historic Figures*, 810 F.2d 243, 250 (D.C. Cir. 1987)).

In *Bridge*, the Ninth Circuit set forth the measure of just compensation damages for temporary regulatory takings:

> In a temporary regulatory taking case, just compensation damages are modified because "the landowner's loss takes the form of an injury to the property's potential for producing income or an expected profit," not the loss of the property itself.  *Wheeler v. City of Pleasant Grove*, 833 F.2d 267, 271 (11th Cir. 1987).  In these circumstances, "[t]he landowner's compensable interest . . . is the return on the portion of fair market value that is lost as a result of the regulatory restriction.  Accordingly, the landowner should be awarded the market rate return computed over the period of the temporary taking on the difference between the property's fair market value without the regulatory restriction and its fair market value with the restriction."  *Id*. (citing *Nemmers v. City of Dubuque*, 764 F.2d 502, 505 (8th Cir. 1985)).

4

950 F.3d at 632 n.12.  DW agrees that this is the proper measure

of damages.  *See, e.g.,* ECF No. 220, PageID #s 5377-79.  In

opposing one of the motions in limine (Motion in Limine No. 9,

seeking to preclude evidence pertaining to DW's name and business

reputation), DW explained that this calculation of damages allows

"the landowner [to] recover[] what he lost.  To award any

affected party additional compensation for lost profits or

increased costs of development would be to award double recovery:

the relevant fair market values by definition reflect a market

estimation of future profits and development costs . . . ."  ECF

No. 258, PageID # 9047.

          Just compensation for temporary regulatory takings do

not include consequential damages such as lost profits, moving

expenses, and loss of goodwill.  *See also United States v. Gen.

Motors Corp.*, 323 U.S. 373, 379 (1945) (noting in an eminent

domain case that just compensation does not include lost profits,

expense of moving, loss of goodwill, and other consequential

losses); *Ideker Farms, Inc. v. United States*, 71 F.4th 964, 987

(Fed. Cir. 2023) (ruling that consequential damages, such as lost

profits, loss of goodwill, and the cost of moving to a new

facility, are not awardable under the Fifth Amendment); *United

States v. 10.56 Acres, More or Less, situated in Whatcom Cnty.,

Wash.*, 2008 WL 3977614, at *5 (W.D. Wash. Aug. 22, 2008) (ruling

that consequential damages, including opportunity costs, lost

profits, loss of goodwill, and relocation expenses, are not compensable under the Fifth Amendment).  Similarly, just compensation damages do not include damages arising out of governmental interference with contractual rights, as those damages are also consequential damages not awardable with respect to takings claims.  *See DW*, 2022 WL 1665311, at *9.

Keeping in mind the contours of DW's remaining takings claim and DW's asserted just compensation damages, the court turns to Hawaii's motions in limine.  This court has previously issued an order addressing Hawaii's Motion in Limine No. 1. Motion in Limine Nos. 2 through 16 are now before the court.

## II.        MOTION IN LIMINE NO. 2.

On December 20, 2023, Hawaii filed Motion in Limine No. 2, seeking to exclude lay testimony by Robert Wessels with respect to (1) the lack of economic feasibility of agricultural uses of the property, and (2) the value of DW's possessory interest in the property.  Hawaii argues that Wessels lacks personal knowledge to support his testimony that the property was worthless in an agricultural zone because it was a lava field suitable only for housing development.  Hawaii argues that any such statements by Wessels lack material value and should be excluded as irrelevant, likely to cause unfair prejudice, misleading to the jury, and unhelpful.  *See* ECF No. 199.

On January 9, 2023, DW filed its opposition to the motion. DW argues that Wessels has personal knowledge and experience that allow him to testify that there were no other uses for the property and that the value of the land in agricultural zoning was worthless. *See* ECF No. 212. In opposing motions for summary judgment that are now pending before the court, Wessels, a principal in DW, submitted a declaration indicating that, once the LUC reverted the land from urban to agricultural use, "the project was worthless." *See* ECF No. 190-1, PageID # 4767. Wessels does not detail precisely how the reversion order affected the value of the property before reversion, saying only that all value was eliminated by the reversion. He does not, for example, provide any dollar value for the property before reversion, saying only that all value was eliminated by the reversion because the reversion left "no use for the land except public Lava views for which you can't get any income." ECF No. 190-1, PageID # 4768. In deposition testimony, he admitted that DW did not actually explore other uses for the land. *See* ECF No. 199-3, PageID # 4985. In short, "neither [he] nor DW actually did a valuation of what else might be able to be done with the property and agricultural use." *See* ECF No. 254-2, PageID # 9019.

On January 17, 2024, Hawaii filed a reply in support of its Motion in Limine No. 2. *See* ECF No. 254.

The court denies Motion in Limine No. 2.  Wessels's reliance on his personal knowledge and experience does not render his lay opinion inadmissible.  The failure by Wessels and DW to consider nonresidential uses for the property goes to credibility, not admissibility.  Nor does Wessel's failure to consider other possible uses for the property render irrelevant his personal lay opinion as a DW principal that the land became worthless.  The grounds raised in Motion in Limine No. 2 do not suffice to preclude Wessels's lay opinion.

**III.      MOTION IN LIMINE NO. 3.**

On December 28, 2023, Hawaii filed Motion in Limine No. 3, seeking to preclude DW from presenting evidence of consequential damages, including contract damages, evidence of lost profits, interest costs, lost business opportunities, increased land acquisition costs, inability to obtain financing, and damages to business name and reputation.  *See* ECF No. 203.

On January 15, 2023, DW filed its opposition to Motion in Limine No. 3.  *See* ECF No. 220.

As noted earlier in this order, consequential damages are not recoverable for a temporary regulatory taking. Accordingly, to the extent Motion in Limine No. 3 seeks to preclude DW from presenting evidence of consequential damages, including lost profits and other losses incurred as a result of alleged interference with contract rights, the motion is granted.

However, this ruling does not mean that all evidence of lost profits is necessarily irrelevant.  The *Penn Central* takings analysis requires examination of three factors to determine whether a regulatory taking is the functional equivalent of a classic taking: "(1) '[t]he economic impact of the regulation on the claimant,' (2) 'the extent to which the regulation has interfered with distinct investment-backed expectations,' and (3) 'the character of the governmental action.'"  *Bridge Aina Le`a*, 950 F.3d at 630 (quoting *Penn Central Transportation Company v. City of New York*, 438 U.S. 104, 124 (1978)).  DW may introduce evidence of distinct investment-backed expectations for the relevant takings period, such as realistic lost profits, in the course of seeking to prove that a *Penn Central* taking occurred.  This evidence is distinguishable from evidence offered to prove lost profits as damages.  Thus, in *Bridge*, with respect to the distinct investment-backed expectation prong of the *Penn Central* test, the Ninth Circuit examined whether Bridge had a reasonable hoped-for return on its investment and whether the reversion had meaningfully interfered with the hoped-for return during the takings period.  950 F.3d at 634.

To clarify, this court rules that DW may not introduce evidence that its damages include profits lost outside the takings period.  Such profits are not recoverable.  Thus, DW may not seek damages in the form of profits allegedly lost because of

the LUC's 2009 oral vote.  At most, DW may present evidence of distinct investment-backed expectations relating to an alleged *Penn Central* taking to the extent those expectations relate to the 2011 written reversion order that caused the taking.  This court recognizes Hawaii's concern that allowing evidence of investment-backed expectations invites confusion with evidence of damages and that the court's restriction on damage evidence could be eviscerated thereby.  The court thinks this danger can be addressed with limiting instructions that Hawaii should feel free to draft.

## IV.     MOTION IN LIMINE NO. 4.

On January 8, 2024, Hawaii filed Motion in Limine No. 4, seeking to preclude evidence of the value of DW's development rights.  *See* ECF No. 207.  DW did not oppose this motion.

On May 5, 2022, this court ruled that, to the extent DW's takings claim was based on a contractual right to develop the residential property under a joint development agreement, the Takings Clause did not protect that right.  Accordingly, the court granted summary judgment in favor of Hawaii with respect to DW's takings claim to the extent it was based on a contractual right to develop the property.  *See* 2022 WL 1665311, at *8-*10. That ruling was not appealed and is law of the case.

The court grants Motion in Limine No. 4 in part.  The court precludes DW from seeking to prove just compensation damages based on its claim that the development rights became worthless.  Any such evidence does not go to the proper measure of just compensation damages.  However, to the extent Motion in Limine No. 4 seeks to exclude development rights damages for other purposes, the motion is denied if DW can show that those rights are relevant to its distinct investment-backed expectations for purposes of demonstrating a *Penn Central* taking.  That evidence is not precluded by this order.

## V.        MOTION IN LIMINE NO. 5.

On January 8, 2024, Hawaii filed Motion in Limine No. 5, seeking to preclude DW from presenting evidence regarding the alleged effects of LUC actions or proceedings before April 25, 2011, when the LUC issued its written reversion order.  *See* ECF No. 208.

On January 22, 2024, DW filed its opposition to Motion in Limine No. 5.  *See* ECF No. 255.  DW argues that matters that happened as a result of the LUC's voice vote in 2009 affected DW's distinct investment-backed expectations (one of the prongs of the *Penn Central* takings test).

The court, which is not writing on a blank slate, grants the motion in part.

11

As noted above, the Ninth Circuit ruled in *Bridge* that the relevant takings period with respect to the very regulatory taking alleged by DW began on April 25, 2011, when the LUC issued its written order reverting the property from urban to agricultural use, and ended when the state trial court reversed the LUC's order on June 15, 2012. At the hearing on Motion in Limine No. 5, DW agreed that the relevant takings period began on April 25, 2011, stating that it was not suggesting that any reversion happened before the LUC's 2011 written reversion order.

In *Bridge*, 950 F.3d at 632, the Ninth Circuit recognized that two years before the LUC's 2011 written reversion order, the LUC had orally reverted the land, and that DW had then lost funding and defaulted on its contractual obligation to purchase the land. The Ninth Circuit nevertheless did not treat the voice vote as starting the takings period, focusing instead on the 2011 written reversion order and ruling that it had begun any taking. *Id.* at 633 (citing *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 216 F.3d 764, 783 n.33 (9th Cir. 2000), *rev'd on other grounds*, *Gonzalez v. Ariz.*, 677 F.3d 383, 389 n.4 (9th Cir. 2012) (en banc)).

The *Bridge* decision appears to have treated the LUC's voice vote as nonfinal. Indeed, DW moved to stay entry of any order with respect to the oral decision of April 30, 2009, pending consideration of additional evidence. On June 5, 2009,

the LUC granted that request and stayed the entry of its reversion order pending a further hearing.  After receiving additional evidence at that further hearing, the LUC, by a 6-3 vote, rescinded its April 2009 voice vote and vacated the accompanying order to show cause, on condition that sixteen affordable units be completed by March 31, 2010.  *See DW Aina Le`a*, 134 Haw. at 197-99, 339 P.3d at 695-97.

Nothing in the record suggests that state officials would have enforced the agricultural reversion on the basis of the voice vote.  On this point, there may or may not be additional evidence to be had, but if there is such evidence, it is not in the record, neither in connection with pending summary judgment matters to which this evidence would be highly relevant, nor in connection with Motion in Limine No. 5.  This court is thus in the same position as the Ninth Circuit was in *Bridge* and has no ground to diverge from the takings period defined in *Bridge*.

With respect to distinct investment-backed expectations, the Ninth Circuit noted in *Bridge* that the landowner had hoped to make a 20 percent annual return.  *Bridge* ruled that, even if that hoped-for return was reasonable, the 2011 written reversion order "could not have meaningfully interfered with it" during the takings period because the landowner did not expect any profit unless and until the LUC

13

amended the 1991 affordable housing condition.  At the time of the 2011 written reversion order, there were only sixteen uninhabitable units built.  *Bridge* noted that the landowner therefore could not have had a reasonable expectation of making a 20 percent return during the takings period.  *Id.*

Given the focus in the *Bridge* decision on whether the 2011 written reversion order affected the landowner's distinct investment-backed expectations for the takings period, this court views the relevant period for DW to be focusing on, both in terms of distinct investment-backed expectations and in terms of damages, as the actual takings period from 2011 to 2012.  Thus, to the extent the motion seeks to preclude DW from using evidence outside of the takings period to establish a taking or any damage amount, the motion is granted.  However, the court is not precluding DW from mentioning what occurred, including what occurred to DW, in the course of telling the story of this dispute.  Limiting instructions should suffice to avoid abuse.

**VI.**      **MOTION IN LIMINE NO. 6.**

On January 8, 2024, Hawaii filed Motion in Limine No. 6, seeking to preclude DW from introducing evidence of land value based on the "subdivision approach" (also known as the "lot method" and the "developer's residual approach").  *See* ECF No. 209.  Hawaii argues that the "subdivision approach" is so

14

speculative that it is unfairly prejudicial and is likely to confuse issues and mislead the jury.  *Id.*

On January 22, 2024, DW filed its opposition to Motion in Limine No. 6.  *See* ECF No. 266.  DW's opposition argues in a conclusory fashion that it should be permitted to offer testimony of the "subdivision approach" because the sale of homes was imminent and not purely speculative.

In an eminent domain proceeding, the Ninth Circuit examined just compensation for property.  It began by noting that there are generally three recognized appraisal methods for ascertaining a property's fair market value: (1) comparable sales; (2) income or capitalization of income; and (3) reproduction cost at the time of the taking, less depreciation.  *United States v. 99.66 Acres of Land*, 970 F.2d 651, 655 (9th Cir. 1992).  The Ninth Circuit noted:

> Courts occasionally allow valuation testimony on a fourth method, called either the lot method or the developer's residual approach. An appraiser using the lot method estimates a sale price for each individual, developed lot, multiplies that price by the number of lots in the tract, then deducts estimated costs of development and marketing.  The sales price total is also adjusted downward, or discounted, to account for the sale occurring in a single transaction now rather than numerous transactions over time.  To determine fair market value for the purposes of just compensation, the comparable sales method is preferred, but the lot method may be used where no comparable sales exist and facts show that a market for individual lot sales is not speculative.

*Id.*

It is not at all clear that DW has the necessary facts to support a "subdivision approach" for determining the fair market value of the property. First, in DW's case in chief, Wessels may only testify as a lay witness. The record does not show that he has the personal experience to testify as an "appraiser."

Even if the court examines Wessel's rebuttal expert disclosure, ECF No. 162-2, PageID #s 4323-27, he does not appear to be trying to establish the fair market value of the property using the "subdivision approach." Instead, he states that DW lost development rights worth $72,582,760 with respect to a 37.86-acre property and $598,566,808 with respect to a 1,034-acre property. *See id.*, PageID # 4326; ECF No. 209-3 ("Q: And just so we're clear, are those numbers, the 72 million and the 598 million numbers, are those damages that DW seeks in this case? A: Yes, I believe they are for the developer rights."). As already noted, under this court's prior ruling, DW cannot maintain a takings claim based on lost development rights. *See* 2022 WL 1665311, at *9.

DW appears to want to argue through Wessels or otherwise that the value of the lost development rights is related to the value of the property before the takings period began and that the value of the property afterward was zero.

16

This court has discussed this DW approach in connection with other motions in limine.  Regardless of how DW ultimately presents its claims, any attempt to use the "subdivision approach" is barred as too speculative to be admissible.

For example, in connection with a summary judgment motion currently before this court, Wessels says that DW lost $22,270,364 in profits during the takings period.  *See* ECF No. 190-1, PageID # 4767.  Wessels explains that, because DW's funding stopped, it could not complete the utilities necessary to obtain the certificates of occupancy for the first sixteen affordable units.  Because it could not sell those units, it lost cash flow from the sales of those units that could have been used to fund construction of additional units, ultimately leading to the $22,270,364 in allegedly lost profits.  *See id.*

DW conceded at the summary judgment motion hearing in December 2023, however, that funding was lost as a result of the LUC's 2009 voice vote, not because of the LUC's 2011 written reversion order.  *See* ECF No. 194, PageID #s 4936-37 (admitting that the flow of funding to DW stopped upon the LUC's voice vote, rather than upon its written order reverting the property).  If DW lacked funding before the written reversion order to complete the initial affordable units, DW cannot point to that order as having prevented the sale of those units and having robbed DW of the capital necessary to develop the next phase, and so on.

17

The court additionally notes that DW may be conflating its rights relating to the affordable housing parcel with Aina Le`a's rights, as DW had assigned those rights to Aina Le`a in December 2009. *See* ECF No. 142-9, PageID # 3440.  At the same time, Bridge conveyed the affordable housing parcel to Aina Le`a. *See* ECF No. 142-10.  Thus, it is not at all clear that a lack of funding prevented DW itself from completing the first sixteen units in the affordable housing parcel.

In any event, Wessels's projection that DW lost development rights worth $72,582,760 with respect to a 37.86-acre property and $598,566,808 with respect to a 1,034-acre property is entirely speculative.

Nor does the record reflect that the sale of the homes was imminent, as stated in the opposition to this motion. *See* ECF No. 266, PageID # 9488.  While DW says it could have begun selling the first units six months after the 2011 reversion, Wessels admitted that "there was a substantial amount of infrastructure work that remained" at that time. *See* ECF No. 209-3, PageID #s 5150-51.  The record simply does not establish that, but for the 2011 reversion, DW would have had the funding to complete and sell the sixteen affordable housing units on the affordable housing parcel owned by Aina Le`a.  Accordingly, the court determines that reliance on any such sales to determine the

value of the property allegedly taken is too speculative to allow the use of the "subdivision approach."

Motion in Limine No. 6 is granted, and DW is precluded from introducing evidence of land value based on the "subdivision approach."

**VII.    MOTION IN LIMINE NO. 7.**

On January 9, 2024, Hawaii filed Motion in Limine No. 7, seeking to preclude DW from presenting testimony regarding the purported $17 million note memorializing a debt owed by Aina Le`a to DW.  *See* ECF No. 211.  DW has admitted that no such note exists.  Hawaii therefore argues that DW should be precluded from discussing any specific note terms, including a term allegedly entitling DW to Aina Le`a's first $17 million in profits.

On January 22, 2024, DW filed its opposition to the motion.  *See* ECF No. 256.  While DW concedes that there is no note, DW argues that Wessels should still be allowed to testify about the debt that the note supposedly represents.

The precise terms of the $17 million debt are irrelevant to DW's takings claim.  In reversing this court's ruling that DW lacked standing to pursue its takings claim, the Ninth Circuit held that this court had "erred by concluding that DW lacked Article III standing.  DW holds an unsecured note that obligates Aina Le`a to pay DW $17 million after the sale of the residential portion of the property."  DW therefore has standing

19

to assert its remaining takings claim based on its alleged right
to possess the residential property and the harm it alleges it
suffered.  But the note in not otherwise relevant.

DW conceded at the recent hearing on remand that there
was never a physical note through which Aina Le`a was obligated
to pay DW $17 million.  *See* Transcript of Proceedings (Dec. 5,
2023), ECF No. 194, PageID # 4924 ("I do not believe that there's
a physical note").  Instead, the claimed $17 million obligation
was based on a January 2012 agreement through which DW assigned
its rights to the residential property and the parties agreed
that, if Aina Le`a acquired the residential property, "AINA LE`A
shall pay DW for this assignment[] the sum of $17,000,000, to be
paid by AINA LE`A issuing its unsecured note, which note shall
then be paid from the proceeds of future parcel resales."  The
agreement did not say that DW would receive the first $17 million
of those resale parcels.  *See* ECF No. 142-15, PageID # 3637.

DW first asserted a right to the first $17 million of
Aina Le`a's profits long after the Complaint in this matter had
been filed.  By the time of the assertion, the statute of
limitations had run on any claim Aina Le`a might have wanted to
make, the Bankruptcy Court had determined that Aina Le`a owned
the takings claims at issue, and Hawaii had sought summary
judgment on the ground that DW lacked standing to pursue a
takings claim.  In making its assertion, DW relied on a document

backdated to December 30, 2015, but actually drafted in March 2022 to oppose Hawaii's summary judgment motion challenging DW's standing.  Besides Wessels's unsupported statements of entitlement to the first $17 million, *see,* e.g., ECF No. 76-4, PageID # 1891, ECF No. 78-6, PageID # 2384, the record contains no admissible evidence establishing DW's claims of entitlement to the first $17 million.  The most the record contains is a document stating, "Within 90 days following the end of each fiscal year[,] Aina Le`a Inc. will pay 10% of the net profit from [the residential properties] to DW Aina Le`a Development, LLC, until such time as $17 million has been paid to DW Aina Le`a Development, LLC."  ECF No. 142-17, PageID #s 3672-73.

DW conceded at the hearing held in December 2023 that the only basis of its claim to the first $17 million is the January 2012 agreement discussed in the previous paragraph.  That document does not speak to the priority of DW's alleged entitlement.  *See* ECF No. 194, PageID # 4925.

Whether DW is entitled to the first $17 million of Aina Le`a's profits or is simply owed $17 million by Aina Le`a does not matter for purposes of the present ruling.[1]  The court grants

---

[1]At the hearing in December 2023, the court asked DW to identify language in the Complaint indicating that DW was asserting a claim for damages based on Aina Le`a's interest in the property.  DW could not identify any such language in the Complaint.  *See* ECF No. 194, PageID #s 4932-34.  On November 30, 2023, the court denied DW's request to either amend its Complaint to add Aina Le`a, Inc., as a party or to allow DW to assert Aina

Motion in Limine No. 7 to the extent the motion seeks to preclude
DW from introducing evidence that a $17 million note exists or
from offering terms of the purported note (such as a provision
regarding the first $17 million of Aina Le`a's profits).
However, to the extent the motion seeks to prevent DW from
introducing evidence regarding the transfer of its right to the
residential property to Aina Le`a, including the price of that
transfer, the motion is denied.  The actual terms of the supposed
$17 million debt are irrelevant, as those terms do not go towards
DW's damages for the alleged taking (which do not include
contractual damages) or any other issue remaining in this case,
but evidence of the fact of the $17 million debt is not
precluded.

**VIII.      MOTION IN LIMINE NO. 8.**

On January 9, 2024, Hawaii filed Motion in Limine
No. 8, seeking to preclude DW from presenting evidence of Aina
Le`a's damages.  *See* ECF No. 213.

DW opposes the motion, arguing that it should be
allowed to present evidence of Aina Le`a's damages because DW is

---

Le`a, Inc.'s claims.  *See* ECF No. 186.  In denying the request,
this court stated: "Just as DW cannot now add a party to assert
untimely claims, DW cannot now amend its Complaint to pursue
claims on its own behalf belonging to Aina Le`a.  Such claims
would be untimely.  Amendment to add those claims would be futile
because of the six-year statute of limitations."  *Id.*, PageID
# 4702.

allegedly entitled to the first $17 million of those damages. *See* ECF No. 257.

This motion is similar to Motion in Limine No. 7.  For the same reasons, the court grants Motion in Limine No. 8 and precludes DW from presenting evidence of Aina Lea`s damages. Aina Lea's damages are irrelevant to DW's takings claim in this action.

## IX.        MOTION IN LIMINE NO. 9.

On January 9, 2024, Hawaii filed Motion in Limine No. 9, seeking to preclude DW from presenting evidence of damages to DW's business name and/or reputation.  *See* ECF No. 214. Hawaii argues that such evidence is irrelevant, as damages to a business name and/or reputation are not properly awardable for regulatory takings claims.  *Id.*

On January 22, 2024, DW filed its opposition to the motion.  *See* ECF No. 258.  DW argues that evidence of damages to its name and reputation are relevant to its distinct investment-backed expectations, one of the elements of a *Penn Central* takings claim.

Motion in Limine No. 9 is granted.  The proper measure of damages for a temporary regulatory takings claim was set forth above.  Such damages do not include damages arising out of harm to a business's name or reputation, and are instead measured by the damage to the property.

23

**X.        MOTION IN LIMINE NO. 10.**

On January 10, 2024, Hawaii filed Motion in Limine No. 10, seeking to preclude DW from presenting evidence of reports and opinions of third parties for the truth of the matter asserted when the third parties have not been designated as witnesses and there is no applicable exception to the hearsay rule. *See* ECF No. 216.

On January 22, 2024, DW filed its opposition to the motion. *See* ECF No. 259.

The court denies the motion at this time without prejudice to its being renewed with respect to particular evidence in the future, when the court can discern the context in which evidence is offered. The court declines to make a blanket ruling. For example, if DW seeks to introduce evidence that Hawaii objects to on hearsay grounds, the court will give DW a chance to argue that a particular hearsay exception applies (e.g., that the evidence is a business record for purposes of Fed. R. Evid. 803(6)). Or, if Wessels is qualified as a rebuttal expert, under Rule 703, he may base an opinion on facts or data that experts in the field would reasonably rely on.

**XI.       MOTION IN LIMINE NO. 11.**

On January 10, 2024, Hawaii filed Motion in Limine No. 11, seeking to preclude Paul Brewbaker from offering legal conclusions, including opinions as to whether a taking occurred.

24

*See* ECF No. 217; *United States v. Scholl*, 166 F.3d 964, 973 (9th Cir. 1999) (noting that experts should not testify about the law, but instead interpret and analyze factual evidence).

On January 22, 2024, DW opposed the motion, agreeing that Brewbaker may not testify about the law and noting that DW does not intend for Brewbaker to do so, and arguing that the motion should therefore be denied as unnecessary. *See* ECF No. 260.

The court grants the motion as unopposed, seeing no prejudice to DW.  Brewbaker is precluded from giving opinions about the law.  To the extent he is qualified as a rebuttal expert, he may give opinions within the scope of what he is qualified to testify on (e.g., damages) to rebut Hawaii's evidence.

Hawaii expressed concern that Brewbaker would try to characterize legal opinions as testimony about damages.  That is a subject for objections during trial.

**XII.    MOTION IN LIMINE NO. 12.**

On January 15, 2024, Hawaii filed Motion in Limine No. 12, seeking to preclude DW from presenting evidence of alleged takings or damages based on any interest other than DW's possessory interest in the residential property.  *See* ECF No. 222.

25

On January 22, 2024, DW opposed the motion, agreeing that its takings claim arises out of its possessory interest in the residential property, but arguing that it should also be able to pursue the first $17 million of Aina Le`a's claims.  *See* ECF No. 261.

The motion is granted.  While Aina Le`a may have some claim to profits that include the first $17 million that DW says Aina Le`a owes DW, DW's taking damages are to be calculated as the rate of return discussed earlier in this order.  DW's damages do not include Aina Le`a's damages, and DW's assertion that it is entitled to money from Aina Le`a does not mean that it may assert Aina Le`a's claims.

## XIII.   MOTION IN LIMINE NO. 13.

On January 15, 2024, Hawaii filed Motion in Limine No. 13, seeking to preclude DW from presenting evidence and argument as to the propriety of the LUC's 2011 written order reverting the land use classification of the residential property from urban to agricultural.  *See* ECF No. 223.

On January 22, 2024, DW opposed the motion, arguing that it needs to present evidence at trial establishing that the reversion order was improper to establish a taking.  *See* ECF No. 262.

Because there does not appear to be a stipulation that the LUC's written order was improper, evidence of that alleged

impropriety (including the state court's reversal of it) is
relevant to DW's takings claim.  Motion in Limine No. 13 is
denied.

**XIV.     MOTION IN LIMINE NO. 14.**

On January 15, 2024, Hawaii filed Motion in Limine
No. 14, seeking to preclude rebuttal expert testimony by Paul
Brewbaker and Robert Wessels, who were identified as rebuttal
experts in ECF Nos. 159 and 162.  *See* ECF No. 224.

On January 22, 2024, DW filed its opposition to the
motion.  *See* ECF No. 263.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509
U.S. 579, 589 (1993), the Supreme Court examined a scientific
expert and held that expert testimony is admissible only if it is
both relevant and reliable.  In *Kumho Tire Co. v. Carmichael*, 526
U.S. 137, 146 (1999), the Court explained that the presiding
judge's role (or gatekeeping function) in ensuring the
reliability and relevancy of expert testimony extends to all
expert testimony.

*Daubert* listed nonexclusive factors, such as testing,
peer review and publication, error rates, and acceptance in the
relevant community, some or all of which might help a court to
determine the reliability of a particular theory or technique.
*Daubert*, 509 U.S. at 593–94.  The *Daubert* test is "flexible," and
the "list of specific factors neither necessarily nor exclusively

27

applies to all experts or in every case.  Rather, the law grants
a district court the same broad latitude when it decides how to
determine reliability as it enjoys in respect to its ultimate
reliability determination." *Kumho*, 526 U.S. at 141.

Even dubious opinions may pass the *Daubert* gatekeeping
requirements.  *See Dorn v. Burlington N. Santa Fe R.R. Co.*, 397
F.3d 1183, 1196 (9th Cir. 2005) ("The Supreme Court in *Daubert v.
Merrell Dow Pharmaceuticals, Inc.*, was not overly concerned about
the prospect that some dubious scientific theories may pass the
gatekeeper and reach the jury under the liberal standard of
admissibility set forth in that opinion; indeed, the Court said,
'Vigorous cross-examination, presentation of contrary evidence,
and careful instruction on the burden of proof are the
traditional and appropriate means of attacking shaky but
admissible evidence.'" (quoting *Daubert*, 509 U.S. at 596); *S.M.
v. J.K.*, 262 F.3d 914, 921 (2001) ("A court may admit somewhat
questionable testimony if it falls within the range where experts
might reasonably differ, and where the jury must decide among the
conflicting views." (internal quotation and citation omitted), *as
amended by* 315 F.3d 1058 (9th Cir. 2003)).

This court need not decide at this time whether, in its
gatekeeping role, it should qualify Brewbaker or Wessels as a
rebuttal expert witness.  Under *Daubert*, 509 U.S. at 589, this
"judge must ensure that any and all [expert] testimony or

evidence admitted is not only relevant, but reliable."  But that does not mean that this judge must hold an evidentiary hearing in advance of trial.  *See United States v. Alatorre*, 222 F.3d 1098, 1104 (9th Cir. 2000) (recognizing that trial court has discretion with respect to timing of *Daubert* hearing and that trial court need not conduct pretrial hearing); *United States v. Leones*, 2009 WL 10695612, at *3 (D. Haw. Jan. 26, 2009) ("In interpreting the Supreme Court's holding in *Daubert*, however, the Ninth Circuit Court of Appeals has repeatedly stated that a trial court is not required 'to conduct separate, pretrial hearings to discharge their gatekeeping duties' under *Daubert*.").

Pending before this court are summary judgment proceedings that could theoretically negate the need to address any Rule 702 matter.  Even if this case proceeds to trial, Brewbaker and Wessels have only been named as rebuttal experts.  Possibly, this matter might be decided by a motion for judgment as a matter of law at the close of DW's case in chief.  In either event, rebuttal expert testimony would be unnecessary.  Accordingly, the court denies Hawaii's request for a determination at this time as to whether Brewbaker and Wessels may testify as rebuttal experts.  Hawaii may renew its request for a *Daubert* hearing at a later time before Brewbaker or Wessels actually presents rebuttal expert testimony.

**XV.      MOTION IN LIMINE NO. 15.**

On January 15, 2024, Hawaii filed Motion in Limine No. 15, seeking to preclude DW from presenting evidence of, or from, documents identified and relied on in depositions but not produced to Hawaii.  *See* ECF No. 225.

On January 22, 2024, DW filed its opposition to the motion, arguing that the documents had, in fact, been produced to Hawaii.  *See* ECF No. 264.

On February 1, 2024, Hawaii filed a supplement, describing the documents that remain in issue with respect to Motion in Limine No. 15.  This supplemental filing indicates that DW sent documents and an explanation minutes before Hawaii's supplemental filing was due.  *See* ECF No. 280.  As a result, the parties clearly have not yet discussed the particulars of each document in issue.

This court declines to examine the circumstances under which each particular document has or has not been disclosed to determine which documents are admissible until after the parties have further met and conferred.  The parties must do so no later than March 1, 2024, with respect to any document Hawaii still seeks to preclude in Motion in Limine No. 15.  At least one week before any further meet and confer, Hawaii must provide DW with a list of documents that remain in issue.  Then, at least two business days before the meet and confer, DW shall respond in

writing with a description of exactly when any document in issue was previously produced.

The court postpones ruling on Motion in Limine No. 15, as it appears from the record that the parties have not sufficiently discussed the details of that motion such that they have been able to try to narrow the documents in issue.

## XVI.        MOTION IN LIMINE NO. 16.

On January 22, 2024, Hawaii filed Motion in Limine No. 16, seeking to preclude DW from presenting evidence of damages for delays in the development of the property, arguing that the delays were not caused be the written reversion order, but instead by DW's noncompliance with environmental laws. *See* ECF No. 229.

On January 22, 2024, DW filed its opposition to the motion, arguing that it did comply with environmental laws. *See* ECF No. 265.

Whether environmental laws caused or did not cause damages need not be decided at this time. As noted earlier, consequential damages (i.e., damages for delays to the development of the property) are not compensable for DW's remaining takings claim. Evidence of consequential damages for delays in the development of the property have already been precluded as irrelevant, regardless of whether the delays were or

were not caused by environmental laws.  Accordingly, the court grants Motion in Limine No. 16 on relevance grounds.

**XVII.    CONCLUSION.**

The court grants Motion in Limine Nos. 6, 8, 9, 11, 12, and 16.  Motion in Limine Nos. 2, 10, 13, and 14 are denied. Motion in Limine Nos. 3, 4, 5, and 7 are granted in part.  The court defers its ruling on Motion in Limine No. 15.

It is so ordered.

DATED: Honolulu, Hawaii, February 6, 2024.



/s/ Susan Oki Mollway
Susan Oki Mollway
United States District Judge

*DW Aina Le`a Development, LLC, v. State of Hawaii, Land Use Commission, et al.*, Civ. No. 17-00113 SOM/WRP; ORDER GRANTING MOTIONS IN LIMINE NOS. 6, 8, 9, 11, 12, 16; ORDER DENYING MOTIONS IN LIMINE NOS. 2, 10, 13, AND 14; ORDER GRANTING IN PART AND DENYING IN PART MOTIONS IN LIMINE NOS. 3, 4, 5, AND 7; ORDER POSTPONING RULING ON MOTION IN LIMINE NO. 15 UNTIL A FURTHER MEET AND CONFER OCCURS WITH RESPECT TO IT