IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| DW AINA LE`A DEVELOPMENT, LLC, | ) ) ) | Civil NO. 17-00113 SOM-WRP |
| Plaintiff, | ) ) ) | ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT BASED ON NO LIABILITY (ECF NO. 141) AND LACK OF EVIDENCE (ECF NO. 143) |
| vs. | ) ) | |
| STATE OF HAWAII, LAND USE COMMISSION; STATE OF HAWAII; and DOE GOVERNMENTAL UNITS 1-10, | ) ) ) ) ) | |
| Defendants. | ) ) ) | |
| _____ | ) | |

**ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT
BASED ON LACK OF LIABILITY (ECF NO. 141)
AND LACK OF EVIDENCE (ECF NO. 143)**

I.        INTRODUCTION.

         This case involves the proposed development of land on

the Big Island of Hawaii.  As a condition of having the land

reclassified from agricultural to urban use to allow development

of the land, the developers were required to build affordable

housing.  After decades of receiving unfulfilled promises from

the developers that they would build affordable housing, Hawaii's

Land Use Commission decided to return the land to agricultural

use, meaning the proposed development could not proceed.

         The landowner, Bridge Aina Le`a, LLC ("Bridge"), fka

Bridge Puako, LLC, filed a complaint in state court asserting a

temporary regulatory takings claim by the State of Hawaii.  The

claimant in this case, Plaintiff DW Aina Le`a Development, LLC

("DW"), was not a party in that case, which was removed to this court.  Bridge's case went to trial, with a jury agreeing with Bridge that a taking had occurred.  However, Bridge was awarded only nominal damages.  The Ninth Circuit reversed, ruling that this court should have granted the State of Hawaii's motion for judgment as a matter of law because no reasonable jury could have found from the evidence that a temporary regulatory taking had occurred.  *See Bridge Aina Le`a, LLC, v. State of Hawaii Land Use Commission, et al.*, 950 F.3d 610 (9th Cir. 2020).

In 2017, DW filed the present Complaint in state court against Defendants State of Hawaii Land Use Commission ("LUC") and the State of Hawaii (collectively, "Hawaii").  The Complaint was removed to this court.  Following proceedings in this court and on appeal, only one count remains.  DW's temporary regulatory takings claim is reminiscent of Bridge's claim in the earlier action.  The court grants summary judgment in favor of Hawaii on that remaining count.  In this ruling, the court, as it has noted in earlier rulings, does not write on a blank slate.

Years of litigation before the LUC, the Hawaii trial court, the Hawaii Supreme Court, the Ninth Circuit, the Bankruptcy Court, and this court have resulted in rulings that provide the framework for the present summary judgment ruling.  Particularly relevant is a recent DW statement about the summary judgment motions that are the subject of this order.  DW said

2

emphatically and clearly that, if this court granted Hawaii's
Motion in Limine No. 8, which sought to preclude DW from
presenting evidence of damages allegedly sustained by its
subsidiary, Aina Le`a, DW would have no case.  Asked by this
court for clarification at the hearing on February 6, 2024,
concerning Motion in Limine No. 8, DW said that if Motion in
Limine No. 8 were granted, summary judgment should be granted in
favor of Hawaii.  With these statements, DW appeared to be
acknowledging that DW was seeking damages belonging to a
nonparty, not to DW itself.

      This court has granted Motion in Limine No. 8.  *See* ECF
No. 284.  This court now holds DW to its statement that the
ruling on Motion in Limine No. 8 leaves DW with no regulatory
takings claim.  Hawaii's two summary judgment motions are
granted.

      Even had DW not conceded at the hearing a few days ago
that it would lack a viable claim in the absence of being able to
pursue Aina Le`a's damages, Hawaii would be entitled to summary
judgment on the merits of the claim.

## II.       SUMMARY JUDGMENT STANDARD.

      The standard governing motions for summary judgment has
previously been set forth in this case in the court's order of
May 25, 2022.  *See* 2022 WL 1665311, at *6-*7.  That standard is
incorporated by reference.

III.      BACKGROUND FACTS AND PROCEDURAL HISTORY.

The court begins with an overview of events, followed by a more detailed factual summary.

A.   Overview.

In the late 1980s, a developer convinced the LUC to change the land classification for property on the Big Island of Hawaii from agricultural to urban in return for the developer's promise to build a substantial amount of affordable housing on that land.  Decades later, no habitable affordable housing had been built.  In the interim, the property had been sold to new investors/developers, who successfully petitioned the LUC to reduce the number of affordable housing units required.

In February 2009, Bridge, the landowner, entered into a contract to sell the property to DW.  On April 30, 2009, the LUC voted orally to revert the property to agricultural use.  DW's funding was then held up, allegedly preventing DW from finishing the affordable housing.  Following another hearing, the LUC rescinded its oral vote and vacated the order to show cause underlying it, setting a new deadline for the construction of at least sixteen affordable units.

By June 2010, DW had built what the State Office of Planning noted were sixteen affordable housing units that were uninhabitable shells because they lacked water, sewage, electricity, and paved road access.  The LUC then reinstated the

4

order to show cause and set a hearing on it.  On April 25, 2011, the LUC issued a written order reverting the property from urban to agricultural use.

On June 15, 2012, the state trial court reversed the LUC's order.  Bridge ended up not selling the property to DW. Instead, in November 2015, Bridge sold the property to DW's subsidiary, Aina Le`a, LLC, which later incorporated as Aina Le`a, Inc.

In a related case brought by Bridge involving takings claims arising out of the very circumstances in issue in the present case, the Ninth Circuit ruled that the relevant takings period began with the LUC's written order of April 25, 2011, which reverted the property from urban to agricultural use, not with the LUC's oral vote on April 30, 2009.  The Ninth Circuit said in that case that any taking ended on June 15, 2012, when the state trial court reversed the LUC's order.  This court concludes that it must apply the same takings period to the present case.  At the hearing on Hawaii's motions in limine, DW agreed that the takings period relevant in the present case began with the LUC's written order of April 25, 2011.  *See* Transcript of Proceedings (Feb. 5, 2024), ECF No. 285, PageID # 10584-85.

DW's Complaint, filed on February 23, 2017, was filed within the applicable six-year limitations period.  *See DW Aina Le'a Dev., LLC v. State Land Use Comm'n*, 148 Haw. 396, 406, 477

5

P.3d 836, 846 (2020) (answering a certified question from the
Ninth Circuit by holding that a six-year statute of limitations
applied to state regulatory takings claims).  The Complaint
asserted only DW's claims, not Aina Le`a's.  Four months later,
on June 22, 2017, Aina Le`a filed for chapter 11 bankruptcy.  On
May 24, 2019, the Bankruptcy Court approved a plan reorganizing
Aina Le`a, stating that Aina Le`a retained "All Rights of Action
that were or could be asserted by the Debtor's
predecessor-in-interest, DW," arising out of the LUC's reversion
of the property.  *See generally* ECF No. 72-39.  Thus, in 2019,
Aina Le`a had a right to assert a temporary regulatory takings
claim arising out of the LUC's reversion of the property.  Aina
Le`a has made no such claim, and by now it has been more than six
years since the LUC's written order in 2011.

DW has twice sought to include Aina Le`a's claims in
this case.  Both times, DW was unsuccessful.  *See* ECF Nos. 110
and 186.

Aina Le`a may have assigned its takings claim to DW in
March 2022 in a document backdated to December 30, 2015.  *See* ECF
No. 142-17, PageID #s 3672-73.  That document has a questionable
provenance, but even if that assignment occurred, the takings
claim did not belong to DW at the time the Complaint was filed in
2017.  Certainly, the Complaint does not assert Aina Le`a's
claims.  Aina Le`a's claims (whether belonging to Aina Le`a or

assigned to DW) are not now part of this case.  These circumstances caused this court to grant Hawaii's Motion in Limine No. 8, thereby precluding DW from presenting evidence at trial of Aina Le`a's damages.  *See* ECF No. 284, PageID #s 10558-59.

Aina Le`a's bankruptcy filing demonstrates that the companies viewed themselves as separate entities.  Moreover, Aina Le`a allegedly agreed to pay $14 million more for the property than DW had contracted to pay Bridge.  DW and Aina Le`a have distinguished between themselves as separate entities on multiple occasions, and this court maintains that distinction.

The only claim before this court at this time involves DW's right to possess the property during the takings period, not the development rights for the property.  During the applicable takings period, DW allegedly had a contractual right to purchase the property that allowed it to take immediate possession of the property.  That contract never closed, and Bridge ultimately sold the property to Aina Le`a instead.

This court concluded in earlier proceedings that there were questions of fact with respect to DW's possessory rights to the property but ruled that DW lacked standing to pursue a claim based on possessory rights because DW had transferred those rights to its subsidiary, Aina Le`a.  The Ninth Circuit reversed that ruling, holding that this court had "erred by concluding

that DW lacked Article III standing." Specifically, the Ninth Circuit said, "DW holds an unsecured note that obligates Aina Le`a to pay DW $17 million after the sale of the residential portion of the property."

DW conceded at a recent hearing on remand that there was never a physical note through which Aina Le`a was obligated to pay DW $17 million. *See* Transcript of Proceedings (Dec. 5, 2023), ECF No. 194, PageID # 4924 ("I do not believe that there's a physical note"). The "unsecured note" referred to by the Ninth Circuit is therefore not reflected in an actual document. Instead, the claimed $17 million obligation apparently arose from a January 2012 agreement through which DW assigned its rights to the residential property to Aina Le`a. The parties to the agreement said that, if Aina Le`a acquired the residential property, "AINA LE`A shall pay DW for this assignment[] the sum of $17,000,000, to be paid by AINA LE`A issuing its unsecured note, which note shall then be paid from the proceeds of future parcel resales." *See* ECF No. 142-15, PageID # 3637.

Given the record, this court has granted Hawaii's Motion in Limine No. 7, to the extent that motion sought to preclude DW from introducing evidence suggesting that a $17 million note actually exists or offering evidence of the purported terms of a nonexistent note. *See* ECF No. 284, PageID #s 10557-58. This court, bound by the Ninth Circuit's ruling

that DW has standing to assert its temporary regulatory takings claim, confines DW's standing to a takings claim relating to DW's right to possess the residential property during the applicable takings period.

The background facts are largely undisputed and have been set forth in earlier orders issued by this court, the Ninth Circuit, and the Hawaii Supreme Court.  This court applies those earlier rulings and provides the following more detailed discussion of the background facts.

### B.   The Development History.

#### 1.   The Developers Repeatedly Broke Promises to the LUC.

In November 1987, Signal Puako Corporation petitioned the LUC to reclassify 1,060 acres of land in South Kohala from agricultural to urban.  *See In re Signal Puako Corp.*, Findings of Fact, Conclusions of Law, and Decision and Order, ECF No. 142-3, PageID # 3227; *Bridge Aina Le`a*, 950 F.3d at 619.  Signal Puako proposed to develop the 1,060 acres as the first phase of a 3,000-acre master-planned community, with 600 low-rise apartments and townhouses, 2,160 single-family homes, commercial uses, a golf course and clubhouse, parks, and other facilities.  *See* ECF No. 142-3, PageID # 3232; *DW Aina Le`a Dev., LLC, v. Bridge Aina Le`a, LLC., et al.*, 134 Haw. 187, 192, 339 P.3d 685, 690 (2014).

On January 17, 1989, the LUC granted that petition, subject to Signal Puako's meeting of eleven conditions, including having 60 percent affordable housing, providing potable water at Signal Puako's expense, having open spaces and scenic views, funding and constructing transportation improvements, designing and constructing a sewage treatment plant, providing up to sixteen acres for a public school, filing annual reports with the LUC, and "develop[ing] the Property in substantial compliance with representations made to the Land Use Commission in obtaining the reclassification of the Property." *See* ECF No. 142-3, PageID #s 3263-66; *Bridge Aina Le`a*, 950 F.3d at 619; *DW Aina Le`a Dev., LLC, v. State of Hawaii, Land Use Comm'n*, 2022 WL 1665311, at *2 (D. Haw. May 25, 2022); *DW Aina Le`a*, 134 Haw. at 192, 339 P.3d at 690.   These conditions ran with the title to the land.   *See Bridge Aina Le`a*, 950 F.3d at 619.   The LUC's order did not specify any deadline for meeting the conditions or any penalty for noncompliance.   *See* ECF No. 142-3; *Bridge Aina Le`a*, 950 F.3d at 619.

At some point, Signal Puako sold the 3,000 acres, including the reclassified 1,060 acres, to Puako Hawaii Properties, which sought to amend the LUC's reclassification order.   The LUC agreed to the amendment in 1991, subject to fourteen conditions, many of which were the same as the original conditions.   In relevant part, the LUC maintained the 60 percent

affordable housing condition, stating that "in no event shall the gross number of affordable units be less than 1,000 units."  The LUC's 1991 amended order required Puako Hawaii to "develop the property in substantial compliance with the representations made to the commission."  It warned that "[f]ailure to so develop the Property may result in reversion of the Property to its former classification, or change to a more appropriate classification." *See In re Puako Hawaii Props.*, Amended Findings of Fact, Conclusions of Law, and Decision and Order, ECF No. 142-4, PageID #s 3274, 3324-3329; *Bridge Aina Le`a*, 950 F.3d at 619.

In 1999, Puako Hawaii conveyed the 3,000 acres to Bridge Puako, LLC, the predecessor to Bridge Aina Le`a, LLC.  *See* Deed with Covenants, Conditions and Restrictions, ECF No. 142-6; *Bridge Aina Le`a*, 950 F.3d at 619.  Bridge then petitioned the LUC to amend the reclassification order again, arguing that the 60 percent affordable housing requirement was unfeasible and that a 20 percent affordable housing requirement (385 units) consistent with then-county requirements was more appropriate. *See In re Bridge Aina Le`a, LLC, et al.*, Findings of Fact Conclusions of Law, and Decision and Order granting Petitioner's Motion to Amend Condition, ECF No. 142-5, PageID #s 3342-43; *Bridge Aina Le`a*, 950 F.3d at 619-20; *DW Aina Le`a*, 134 Haw. at 194, 339 P.3d at 692.  The LUC agreed, requiring at least 385 affordable housing units that "meet or exceed all applicable

County of Hawai`i affordable housing standards."  The LUC further
required those units to be "completed in substantial compliance
with the representations made to the Commission."  Additionally,
the LUC required certificates of occupancy for all of the 385
affordable housing units to be provided to the LUC within five
years of November 17, 2005.  *See* ECF No. 142-5, PageID # 3350;
*Bridge Aina Le`a*, 950 F.3d at 620.

        During 2006 and 2007, Bridge periodically provided the
LUC with updates on the project.  *See DW Aina Le`a*, 134 Haw. at
194, 339 P.3d at 692.  At a September 2008 LUC meeting,
commissioners expressed concern that Bridge's reports showed "no
activity" with respect to the conditions of the amended
reclassification order.  *Id.*

        On December 9, 2008, the LUC issued an order to show
cause why Bridge's land "should not revert to its former land use
classification or be changed to a more appropriate
classification."  The LUC told Bridge that it had "reason to
believe that you or your predecessors in interest have failed to
perform according to the conditions imposed and to the
representations and commitments made to the [LUC] in obtaining
reclassification of the [property]."  The LUC accused Bridge of
having failed to provide the required 385 affordable housing
units that Bridge had committed to providing in lieu of paying a
fee to the County of Hawaii.  The order to show cause noted that,

12

under section 205-4 of Hawaii Revised Statutes, the LUC was authorized to impose conditions necessary to ensure "substantial compliance with representations made by the petitioner in seeking a boundary change" and that "absent substantial commencement of use of the land in accordance with such representations, the [LUC] shall issue and serve upon the party bound by the conditions an order to show cause why the property should not revert to its former land use classification or be changed to a more appropriate classification."  The LUC notified Bridge that it would conduct a hearing on the order to show cause.  *See* ECF No. 142-7, PageID #s 3408-09; *DW Aina Le`a*, 134 Haw. at 195-96, 339 P.3d at 693-94.

According to the Hawaii Supreme Court, the LUC held a hearing on January 9, 2009.  At that hearing, an LUC commissioner expressed concern that no affordable homes had been built by Bridge over the previous two decades.  The hearing was continued, with the LUC chairman urging Bridge to review its project and existing conditions and to file a further motion to obtain relief from those conditions, if necessary.  *See DW Aina Le`a*, 134 Haw. at 196-97, 339 P.3d at 694-95.

In February 2009, Bridge agreed to sell the 1,060 acres to DW for $40,700,000 ("First Agreement").  Bridge retained the right to develop the remaining 2,000 acres, as well as the planning rights with respect to placement of the sewage treatment

13

plant, school, and park.  *See* ECF No. 142-8; *Bridge Aina Le`a*, 950 F.3d at 620.  The First Agreement contemplated that Bridge and DW would enter into a Joint Development Agreement.  *See* ECF No. 142-8, PageID # 3415.  DW says that Bridge did not disclose its troubles with the LUC at that time.  *See* Decl. of Robert Wessels, ECF No. 190-1, PageID #s 4765-66.

The First Agreement provided for different closing dates for different parts of the land: a closing date of June 1, 2009, for the affordable housing parcel; a closing date of September 30, 2009, for the residential parcel; and a closing date of October 31, 2009, for the retail parcel.  *See* ECF No. 142-8, PageID #s 3419-22, 3429.  The sale also included a leasehold interest in the Ouli Water Wells.  *See* ECF No. 142-8, PageID # 3422.  The First Agreement provided DW with exclusive possession of the "Urban Land" prior to closing "for so long as [DW] [was] not in default of its obligations" under the agreement.  *Id.*, PageID # 3431.  The First Agreement further provided that, with respect to takings or condemnations prior to closing with damages of $500,000 or more, Bridge was required to give DW written notice thereof.  In that event, the real property would be "considered a defective parcel," and DW would have the right to terminate the agreement and to have "the Retail Deposit" returned.  The parties would then be "released from any further liability hereunder, except as otherwise expressly provided

14

herein." *Id.*, PageID # 3432.  The First Amendment provided that, if DW defaulted, Bridge could cancel the agreement and retain any deposits or other payments.  *Id.*, PageID # 3434.

The LUC resumed the order to show cause hearing on April 30, 2009.  At the end of the hearing, the LUC voted 7-0 to revert the land to agricultural use.  DW moved to stay entry of any order with respect to the April 30 oral vote, pending consideration of additional evidence.  On June 5, 2009, the LUC granted that request and stayed the entry of any order pending a further hearing.  After receiving additional evidence at that further hearing, the LUC, by a 6-3 vote, rescinded its April 2009 voice vote and vacated the order to show cause, on condition that sixteen affordable units be completed by March 31, 2010.  *See DW Aina Le`a*, 134 Haw. at 197-99, 339 P.3d at 695-97.  Given this history, the oral vote of April 20, 2009, was clearly preliminary and not a final order reverting the property from an urban to an agricultural classification.

On December 11, 2009, DW assigned to Aina Le`a, LLC, DW's rights under the First Agreement with respect to the affordable housing parcel.  *See* ECF No. 142-9, PageID # 3440.  At the same time, Bridge conveyed the affordable housing parcel to Aina Le`a.  *See* ECF No. 142-10.  The modification changed the closing dates for the parcels as follows: the date for the affordable housing parcel was changed from June 1, 2009, to

December 11, 2009; the date for the residential housing parcel
from September 30, 2009, to December 31, 2009; and the date for
the retail parcel from October 31, 2009, to February 28, 2010.
*See* ECF No. 142-9, PageID # 3441.

On June 14, 2010, DW submitted a status report to the
LUC, indicating that it had completed the required sixteen
affordable housing units by the March 31, 2010, deadline.  *See DW*
*Aina Le`a*, 134 Haw. at 200, 339 P.3d at 698.  As noted earlier in
this order, the problem was that the sixteen units were
uninhabitable, lacking water, a sewage system, electricity, and
paved road access.  *See Bridge Aina Le`a*, 950 F.3d at 621.

At an LUC hearing on July 1, 2010, DW explained that,
in its view, "completing" the sixteen affordable housing units
meant that the buildings were done and could soon be hooked up to
utilities.  *See* ECF No. 142-11, PageID # 3533.  At that hearing,
Robert Wessels of DW testified that DW could not pay Bridge and
that, as a result, Bridge would not transfer the property to DW
pursuant to the First Agreement.  *See id.*, PageID # 3492.  Abbey
Meyer, the director of the State Office of Planning, asked the
LUC to revert the land to agricultural use until a bona fide
developer made a bona fide proposal.  *See id.*, PageID # 3562.  At
the end of the hearing, an LUC commissioner moved 1) to keep the
order to show cause pending; 2) to schedule a hearing on the
order to show cause; 3) to affirm the deadline of November 17,

16

2010, for certificates of occupancy for all of the 385 affordable housing units; and 4) for a finding by the LUC "that the condition precedent requiring 16 affordable homes be completed by March 31st, 2010 has not been met."  *Id.*, PageID # 3563.  The commissioner clarified that the LUC would be looking at all of the conditions in the reclassification orders, not just the failure to provide affordable housing.  *See id.*, PageID # 3564. The motion passed 8-0.  *See id.*, PageID # 3565.

On April 25, 2011, after a series of motions and hearings, the LUC entered written findings of fact and conclusions of law that reverted the land to agricultural use. The LUC found that, as of January 20, 2011 (over twenty-two years since reclassification was first granted), Bridge and DW had failed to obtain a certificate of occupancy for even a single affordable housing unit, let alone the required certificates or occupancy for 385 units.  While Bridge and DW had approximately forty units in various stages of construction, there was no infrastructure (electrical lines, sewage lines, water lines, and finished roads) for any of them.  As of July 1, 2010, they owed about $5.5 million to Goodfellow Brothers, their general contractor.  Given this history, the LUC found that they were unlikely to complete the 385 affordable housing units in the near future.  Citing this and other violations, the LUC reverted the property to agricultural use.  *See* ECF No. 142-12, PageID

17

#s 3603-04, 3608; *DW Aina Le`a*, 134 Haw. at 203-05, 339 P.3d at 701-03.

Bridge and DW appealed the LUC's final order of April 25, 2011, that reverted the property from urban to agricultural use.  The appeal was addressed to the state circuit court.  See ECF No. 142-14.

### 2. **Aina Le`a, Not DW, Bought the Residential Property From Bridge.**

In January 2012, while the appeal of the LUC's written reversion order was pending in state court, DW assigned its right to purchase the residential property to Aina Le`a, LLC.  *See* ECF No. 142-15; ECF No. 171, PageID # 4410 (stating that "In January 2012, DW assigned to Aina Le`a the portions of the First Agreement allowing the purchase of the Residential Property, and transferred to Aina Le`a the rights and obligations as Buyer thereunder").  At that time, DW was the sole member of Aina Le`a. *See* ECF No. 142-15, PageID # 3637.

This court looks to the "Second Amendment to Purchase/Transfer Agreement Between DW Aina Le`a Development, LLC and Aina Le`a, Inc.," which bears a date of December 30, 2015, but was actually drafted in March 2022 to oppose the earlier summary judgement motion on standing in this case.  *See* ECF No. 93, PageID # 2673.  That document provides that DW assigned its interest in the First Agreement to Aina Le`a "in exchange for a $17 million profit participation interest from the development

18

and sale of lots and homes in 'The Villages of Aina Le`a.'"   ECF
No. 88-5, PageID # 2653.

It is this document that DW claims establishes that "DW
retained the right to collect the first $17 million following
bankruptcy" with "any amount over this $17 million . . .
belong[ing] to Aina Le`a Inc. pursuant to the bankruptcy
disclosure."  *See* ECF No. 88, PageID # 2609.  No document in the
record actually provides for Aina Le'a to pay the first $17
million in profits to DW.  *See* ECF No. 142-15, PageID # 3637.

C.   **Case Law Concerning the Property.**

1.   **The Hawaii Supreme Court Determined that the
LUC's Reversion of the Property Was
Procedurally Flawed.**

On June 15, 2012, the state circuit court invalidated
the LUC's written reversion order on procedural grounds.  *See* ECF
No. 173, PageID # 4462 (admitting same).  The LUC appealed that
order, asking the Hawaii Supreme Court to address the appeal
without going through the Intermediate Court of Appeals first.
The Hawaii Supreme Court agreed to do that.  *See DW Aina Le`a*,
134 Haw. at 208, 339 P.3d at 706.  The Hawaii Supreme Court ruled
that the state circuit court had correctly determined that the
LUC had erred in reverting the property without complying with
the requirements of section 205-4 of Hawaii Revised Statutes.
*Id.* at 109, 339 P.3d at 707.

19

Given the construction that Bridge and DW had completed and the more than $20 million spent on the project, the Hawaii Supreme Court ruled that Bridge and DW had "substantially commenced" use of the land.  That substantial commencement meant that the LUC had to comply with section 205-4 of Hawaii Revised Statutes before reverting the land.  The LUC was required to find by a "clear preponderance of the evidence" that the reversion was reasonable, not violative of section 205-2 of Hawaii Revised Statutes, and consistent with the policies and criteria established pursuant to sections 205-16 and 205-17 of Hawaii Revised Statutes.  The LUC was also required to resolve any order to show cause within 365 days.  These requirements were not met. According to the Hawaii Supreme Court, the LUC had erred in reverting the property without complying with applicable requirements.  *See DW Aina Lea*, 134 Haw. at 216, 339 P.3d at 714.

## 2.    The Ninth Circuit in *Bridge* Ruled that No Taking Had Occurred.

On June 7, 2011, Bridge filed a Complaint in state court against the LUC and its commissioners.  That action was separate from the then-pending appeal in state court of the LUC's reversion order.  Bridge's 2011 case was removed to this court on June 27, 2011.  *See* Complaint, Civ. No. 11-00414 SOM/KJM, ECF No. 1-2.  In relevant part, Bridge's regulatory taking claim went to trial based on circumstances related to those in issue here. After an eight-day jury trial, the jury found that the reversion

20

was a taking.  The defendants brought a post-trial motion for judgment as a matter of law.  This court denied that motion, and the defendants appealed.  The Ninth Circuit agreed with the defendants and reversed, ruling that this court should have granted the post-trial motion because the evidence did not establish a regulatory taking as a matter of law.  *See Bridge Aina Le`a*, 950 F.3d at 618.

The Ninth Circuit's decision in *Bridge* is relevant to an understanding of the present case, which involves the same land and the same LUC reversion.  The Ninth Circuit began its analysis by noting that the Fifth Amendment's Takings Clause prohibits the taking of private property for public use without just compensation.  "A classic taking occurs when the government directly appropriates private property or ousts the owner from his domain."  *Id.* at 625.  The Ninth Circuit noted that, beyond this classic taking context, courts have recognized three types of regulatory takings, examining whether a regulatory taking is "functionally equivalent to the classic taking using 'essentially ad hoc, factual inquiries, designed to allow careful examination and weighing of all the relevant circumstances.'" *Id.* (quoting *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 322 (2002)).

a.   **There Was No *Loretto* Taking in *Bridge*.**

The Ninth Circuit noted that the first recognized regulatory taking is what is called a *Loretto* taking.  This *per se* taking occurs when a government "requires a landowner to suffer a permanent physical invasion" of private property.  *See Bridge Aina Le`a*, 950 F.3d at 625 n.6 (citing *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 538 (2005); *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 102 (1982)).  No *Loretto* taking was asserted in *Bridge* (and no *Loretto* taking has been asserted in this case).

b.   **There Was No *Lucas* Taking in *Bridge*.**

The Ninth Circuit noted that the second recognized regulatory taking is what is called a *Lucas* taking.  This *per se* taking occurs when a regulation completely deprives an owner of "*all* economically beneficial us[e]' of her property."  *Bridge Aina Le`a*, 950 F.3d at 626 (quoting *Lingle*, 544 U.S. at 538; *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1019 (1992) (alteration in original)).

The Ninth Circuit emphasized that *Lucas* takings are "relatively narrow" and "relatively rare," involving government regulations that require land to be left substantially in its natural state.  *Bridge Aina Le`a*, 950 F.3d at 626 (citing *Lucas*, 505 U.S. at 1018).  *Lucas* takings are confined to the "'extraordinary circumstance when no productive or economically

22

beneficial use of land is permitted.'" *Bridge Aina Le`a*, 950
F.3d at 626 (citing *Lucas*, 505 U.S. at 1017).  In a *Lucas* takings
analysis, "the complete elimination of a property's value is the
*determinative* factor." *Bridge Aina Le`a*, 950 F.3d at 627 (citing
*Lingle*, 544 U.S. at 539).  Anything less than a complete
elimination of value requires a *Penn Central* takings analysis
(discussed below).

     *Bridge* determined that no *Lucas* taking had occurred.
Bridge's expert, Steven Chee, opined that the same 1,060 acres at
issue in this case had a fair market value of $40 million on
April 29, 2009, the day before the LUC's voice vote to revert the
land from urban to agricultural use.  Chee testified that the
1,060 acres was worth $6.36 million with an agricultural
classification. *See Bridge Aina Le`a*, 950 F.3d at 627.  Although
disagreeing with Chee's use of the voice vote to mark the
beginning of the takings period, the Ninth Circuit concluded that
the "land's $6.36 million value in an agricultural use
classification was neither de minimis, nor did the value derive
from noneconomic uses. . . .  Thus, the land's value in the
agricultural use classification precludes a *Lucas* finding here."
*Id.* at 629.

     The Ninth Circuit additionally noted that the
permissible uses of the agricultural land "reinforce our
conclusion that the reversion did not completely deprive Bridge

of all economically viable uses of the 1,060 acres as a matter of law." *Id.* Given those other permitted uses in an agricultural district, which included matters not traditionally thought of as agriculture, there was no complete deprivation of all economical uses for the land. *See* Haw. Rev. Stat. § 205-2(d) (listing allowed uses of agricultural land).

### c. There Was No *Penn Central* Taking in *Bridge*.

The Ninth Circuit noted that the third recognized regulatory taking is what is called a *Penn Central* taking, which examines three factors to determine whether a regulatory taking is the functional equivalent to a classic taking: "(1) '[t]he economic impact of the regulation on the claimant,' (2) 'the extent to which the regulation has interfered with distinct investment-backed expectations,' and (3) 'the character of the governmental action.'" *Bridge Aina Le`a*, 950 F.3d at 630 (quoting *Penn Central Transportation Company v. City of New York*, 438 U.S. 104, 124 (1978)). The first and second factors are the primary factors. *Id.* The Ninth Circuit rejected the jury finding in *Bridge* and concluded that the trial evidence did not support a *Penn Central* taking. *See Bridge Aina Le`a*, 950 F.3d at 630.

### (i) Economic Impact.

With respect to an asserted *Penn Central* taking, the Ninth Circuit stated that a court must first examine a regulation's economic impact on a property owner, comparing the value that has been taken from the property with the value remaining in the property. *See id.*, 950 F.3d at 630-31.

In *Bridge*, a valuation expert opined that the value of the 1,060 acres on the day before the LUC's 2009 voice vote to revert the property was $40 million, but only $6.36 million the day after the voice vote, a diminution of $33.64 million or roughly 83 percent.  The Ninth Circuit noted a number of flaws with this opinion.

First, it held that the expert used the wrong date for the reversion, as the reversion did not actually occur until the written LUC order issued in April 2011.  Second, the reversion was temporary, lasting only from the April 2011 LUC written order reverting the property until the state circuit court's judgment in June 2012.  *Id.* at 631-32.  The Ninth Circuit noted that, even using Bridge's desired 20 percent rate of return on investment, given the approximate one-year period, Bridge's damages were at most $6.72 million.  This loss would equate to a 16.8 percent diminution in value from the asserted $40 million value before the voice vote.  The Ninth Circuit held that that percentage weighed "strongly against a taking." *Id.* at 632-33 (citing cases

25

in which 15 percent and 24.8 percent diminutions in value were too small to support takings).  Finally, the Ninth Circuit noted that the disruption of land sale agreements that occurred after the voice vote but before the final reversion order did not establish that the actual reversion order caused a diminution in value.  *Id.* at 633.

### (ii) Interference With Reasonable Investment-Backed Expectations.

The second *Penn Central* factor the Ninth Circuit examined was the extent to which the reversion order interfered with investment-backed expectations that Bridge had for the 1,060 acres, using an objective analysis.  *See Bridge Aina Le`a*, 950 F.3d at 633 (citing *Penn Central*, 438 U.S. at 124).  The Ninth Circuit emphasized that its focus was on Bridge's reasonable expectations at the time of the acquisition of the property. Reasonable expectations had to reflect a reasonable probability of investment-backed expectations, not a "starry eyed hope of winning the jackpot if the law change[d]."  *Id.* at 633-34.

Bridge had put forth evidence that it expected to make an annual return of at least 20 percent of its total investment. *Id.* at 634.  The Ninth Circuit ruled that, even if this expectation was reasonable, "the reversion could not have meaningfully interfered with it during the reversion's one-year duration."  *Id.*

First, Bridge did not expect any profit until the LUC amended the 1991 affordable housing condition of 1000 units.

Second, even if that condition had been amended, Bridge was not expecting immediate profits.  Bridge told the LUC that $86 million in initial infrastructure costs and over $200 million in total development costs had to be spent before any housing units could be sold.  At the time of the reversion, only sixteen affordable housing units had been built, all without infrastructure.  Thus, Bridge could not have expected a 20 percent return during the fourteen-month reversion period.  *Id.*

Third, even if Bridge reasonably expected the LUC to amend the 1991 order's affordable housing unit condition, the reversion was not predicated on a failure to build the units, "but instead on the reclassification conditions."  *Id.*

Fourth, even if Bridge had "substantially commenced" construction for purposes of section 205-4 of Hawaii Revised Statutes, that "substantial commencement" did not eliminate the possibility of reversion.  Instead, "it simply changed the circumstances pursuant to which the [LUC] could exercise its reversion authority."  *Id.* at 635.  The LUC's 1989 and 1991 orders required the landowner to substantially comply with representations made to obtain reclassification of the land to urban use.  Bridge had committed that it would build 385 affordable housing units, and the LUC's 2005 order had set a

27

deadline for those units.  Given Bridge's failure to meet the
deadline for building the 385 units, the Ninth Circuit ruled that
Bridge could not have reasonably expected that the LUC would fail
to enforce the conditions.  *Id.*  The Ninth Circuit ruled, "[W]e
do not see how the Reversion Order interfered with any reasonable
expectations that Bridge could have formed regarding enforcement
or reversion.  Accordingly, we conclude that, as a matter of law,
this factor weighs strongly against finding a taking."  *Id.*

### (iii) The Character of the Government's Action.

The third *Penn Central* factor examined by the Ninth
Circuit involved the character of the LUC's action.  The Ninth
Circuit explained that the government cannot force some people to
bear public burdens that, in fairness and justice, should be
borne by the public as a whole.  In determining whether a taking
has occurred, a court examines whether the government's action
"amounts to a physical invasion or instead merely affects
property interests through some public program adjusting the
benefits and burdens of economic life to promote the common
good."  *Id.* at 635-36.  Even when this third factor weighs in
favor of finding a taking, it is not, by itself, a sufficient
basis for finding a taking.  *Id.* at 636.

In *Bridge*, the Ninth Circuit concluded that the third
factor did not support a taking.  First, the reversion "was
reflective of the confines of a generally applicable Hawaii law

28

land use reclassification procedure." Such a "generally applicable scheme" did not support the third *Penn Central* factor. *Id.*

Second, the Hawaii Supreme Court invalidated the reversion order on statutory procedural grounds, noting that it was neither arbitrary nor unreasonable given the project's long history, the representations made to the LUC, and Bridge's and DW's failure to meet deadlines. *Id.* (citing *DW Aina Le`a*, 339 P.3d at 717). The Ninth Circuit stated that this "history blunts the force of Bridge's assertion that the reversion's character established a taking." *Id.*

> ### d. *Bridge* Set Forth the Measure of Damages for Temporary Regulatory Takings.

In footnote 12 of *Bridge*, the Ninth Circuit set forth the measure of damages for temporary regulatory takings. This court adopts this measure of damages as the appropriate amount of just compensation related to DW's temporary regulatory takings claim:

> In a temporary regulatory taking case, just compensation damages are modified because "the landowner's loss takes the form of an injury to the property's potential for producing income or an expected profit," not the loss of the property itself. *Wheeler v. City of Pleasant Grove*, 833 F.2d 267, 271 (11th Cir. 1987). In these circumstances, "[t]he landowner's compensable interest ... is the return on the portion of fair market value that is lost as a result of the regulatory restriction. Accordingly, the landowner should be awarded the market rate

29

> return computed over the period of the
> temporary taking on the difference between
> the property's fair market value without the
> regulatory restriction and its fair market
> value with the restriction." *Id.* (citing
> *Nemmers v. City of Dubuque*, 764 F.2d 502, 505
> (8th Cir. 1985)).

*Bridge Aina Le`a*, 950 F.3d at 632 n.12.  DW has agreed that this

is the proper measure of damages.  *See, e.g.,* ECF No. 220, PageID

#s 5377-79; ECF No. 258, PageID # 9047.

> **3.    Aina Le`a, the Purchaser of the Residential
> Property, Filed for Chapter 11 Bankruptcy and
> Was Determined in Court Proceedings to Have
> the Right to Bring a Takings Claim Based on
> the LUC's Reversion of the Property.**

As discussed previously, in January 2012, DW and Aina

Le`a agreed to the sale by DW of its rights to the residential

property to Aina Le`a.  *See* ECF No. 142-15, PageID # 3637.  DW

has conceded that Aina Le`a never executed or delivered a

physical note to DW for $17 million to be paid to DW in return

for DW's transfer of rights to Aina Le`a.  *See* ECF No. 194,

PageID # 4924.  The court has now granted Hawaii's Motion in

Limine No. 7 to the extent it sought to preclude DW from

introducing evidence that a note existed or offering purported

note terms at trial.  *See* ECF No. 284, PageID #s 10555-58.

Bridge did not end up selling the residential property

to DW pursuant to the First Agreement.  Instead, on October 16,

2015, which was after the Hawaii Supreme Court's decision in *DW*

*Aina Le`a* but before the Ninth Circuit's decision in *Bridge*,

Bridge sold the property to Aina Le`a.  *See* Purchase and Sale
Agreement for Residential Property at Aina Le`a, ECF No. 142-13
(Oct. 16, 2015); *see also* Limited Warranty Deed, ECF No. 142-14
(recorded in the State of Hawaii Bureau of Conveyances on Nov.
17, 2015).  In the 2015 agreement, Aina Le`a (not DW) agreed to
pay Bridge $10 million immediately and an additional $14 million
via a note.  The parties have agreed that this second agreement
concerning the sale of the residential property ("Second
Agreement") superseded the First Agreement.  *See* ECF No. 142-13,
PageID # 3619.  The Second Agreement closed on November 17, 2015.
See ECF No. 142-16.

        In December 2015, DW and Aina Le`a executed an
agreement stating, "DW Aina Le`a Development, LLC will have no
further interest in 'The Villages of Aina Le`a' except to
transfer any permits or approvals into the name of Aina Le`a
Inc."  ECF No. 142-17.

        Four months after DW filed the Complaint in this
matter, Aina Le`a, Inc., filed for chapter 11 bankruptcy.  *See*
ECF No. 72-39, PageID # 1615.  On May 24, 2019, the Bankruptcy
Court approved a plan reorganizing Aina Le`a.  *See generally* ECF
No. 72-39.  As part of that order, the Bankruptcy Court
recognized that Aina Le`a retained the following:

                All Rights of Action that were or could be
                asserted by the Debtor's predecessor-
                in-interest, DW Aina Le`a Development, LLC
                [in this action] based on the decision and

                                31

> order by Defendants to reclassify the
> Debtor's land from urban classification to
> agricultural classification in violation of
> Plaintiff's constitutional and other rights.

ECF No. 72-39, PageID # 1667; *see also DW Aina Le`a, LLC. v.
Hawaii*, 2022 WL 1665311, at *5 n.5 (May 5, 2022) (describing a
typographical error but noting that the parties do not dispute
that the Bankruptcy Court order was referring to the present
action).

As noted earlier, Aina Le`a allegedly assigned its
takings claim back to DW.  *See* ECF No. 8805, PageID # 2653.  The
assignment appears to have occurred after the filing of the
Complaint in this matter.  The Complaint asserts no claim for
Aina Le`a's damages.  This court has declined to allow DW to
assert Aina Le`a's claims or to include Aina Le`a in this case.
This court has granted Hawaii's Motion in Limine No. 8,
precluding DW from presenting evidence at trial of damages
sustained by Aina Le`a.   *See* ECF No. 284, PageID #s 10558-59.

> **D.    The Law of the Case Provides for What Remains Now
> in Issue**.

On January 7, 2022, Hawaii moved for summary judgment,
arguing in relevant part that DW lacked standing to pursue its
takings claims because it had assigned the right to assert any
such claim to Aina Le`a before this lawsuit was initiated in
2017.  *See* ECF No. 71-1, PageID #s 531-33.

32

By February 4, 2022, DW appears to have recognized that Aina Le`a might have different and more extensive damages than DW with respect to a takings claim against Hawaii.  DW therefore filed a motion to amend the removed Complaint to add Aina Le`a as a party.  *See* ECF No. 76.  Aina Le`a also may have assigned its takings claim to DW, perhaps in March 2022.  *See* ECF No. 8805, PageID # 2653.

This court has previously ruled that the only viable takings claim DW could assert was a claim based on its right to possess the residential property under the February 2009 First Agreement.  *See DW*, 2022 WL 1555311, at *14.  This court noted "that any claim based on that interest would be identical to the claim that the Ninth Circuit concluded failed as a matter of law in the related case filed by Bridge," but that Hawaii had not moved for summary judgment on that basis.  *Id.*, at *13.  This court then ruled that DW lacked standing to pursue such a claim because, before this action began, DW had assigned its claims to Aina Le`a.  *Id.*, at *14.  This court ruled that Aina Le`a's purported 2022 assignment (in the backdated document) did not cure DW's lack of standing at the time the Complaint was filed.  *Id.*, at *17-*18.  Given Aina Lea's assignment of rights, this court ruled that Aina Lea had no interest in the outcome of this action and therefore denied DW's motion to add Aina Le`a as a party.  *Id.*, at *19.

33

When the Ninth Circuit reversed this court's standing decision, ruling that DW had standing based on its holding of "an unsecured note that obligates Aina Le`a to pay DW $17 million after the sale of the residential portion of the property," *see* ECF No. 120, PageID # 3086, the Ninth Circuit left undisturbed this court's definition of DW's taking claim. This court had ruled that DW could not predicate a takings claim on a contractual right to develop the property or on a leasehold interest in wells. *DW*, 2022 WL 1665311, at *8-*10, *13-*14. At this point, DW remains restricted to a takings claim based on its right to possess the residential property even before the closing of the sale by Bridge of that property.

In appealing this court's standing ruling to the Ninth Circuit, DW raised only two issues:

> 1. Whether the District Court erred in concluding that Appellant[] lacks standing to maintain the instant action.
>
> 2. Whether the District Court should have permitted amendment of the scheduling order to permit the Plaintiff-Appellant to add Aina Le'a Inc. as a plaintiff in this action.

Appellant's Opening Brief, No. 22-15858, page 23 of 66 (Oct. 14, 2022).

Because DW did not appeal this court's summary judgment ruling that DW could not maintain any takings claim based on a contractual right to develop the residential property under a joint development agreement or based on a leasehold interest in

34

the Ouli Wells, those issues are not now part of this case.  *See*
*Ortega v. O'Connor*, 50 F.3d 778, 780 (9th Cir. 1995) (holding
that an issue decided by a district court but not raised as error
on appeal may not be challenged on remand); *see also JGR, Inc. v.*
*Thomasville Furniture Indus., Inc.*, 550 F.3d 529, 532 (6th Cir.
2008) ("A party that fails to appeal an issue waives his right to
raise the issue before the district court on remand or before
this court on appeal after remand.  The law-of-the-case doctrine
bars challenges to a decision made at a previous stage of
litigation which could have been challenged in a prior appeal,
but were not."  (alterations, quotation marks, and citation
omitted)); *United States v. Escobar-Urrego*, 110 F.3d 1556, 1560
(11th Cir. 1997) ("'Under the law of the case doctrine, a legal
decision made at one stage of the litigation, unchallenged in a
subsequent appeal when the opportunity existed, becomes the law
of the case for future stages of the same litigation, and the
parties are deemed to have waived the right to challenge that
decision at a later time.'" (quoting *Williamsburg Wax Museum v.*
*Historic Figures*, 810 F.2d 243, 250 (D.C. Cir. 1987)).

        The Ninth Circuit reversed only this court's standing
conclusion, determining that DW had standing based on its
purported unsecured $17 million note from Aina Le`a, LLC, and
that the reversion of the property from urban to agricultural use
"affected the value of the unsecured note."  ECF No. 120, PageID

35

# 3086.  Having sold the residential property to Aina Le`a, DW's only interest in the residential property involved the $17 million note that was supposed to be paid by Aina Le`a to DW from further sales of properties.  The Ninth Circuit did not rule that DW had standing to assert any takings claim Aina Le`a might have owned or that any such claim was even asserted in the Complaint, only that DW had an injury sufficient to support its own takings claim.

Nor did the Ninth Circuit address whether DW should have been allowed to amend its Complaint to add Aina Le`a, Inc., as a plaintiff.  On remand, this court has again denied DW's request to add Aina Le`a as a party or to assert the claims of Aina Le`a.  *See* ECF No. 186.  Basically, DW has attempted to add Aina Le`a's untimely claims to this timely filed action, which this court declined to allow.

IV.      **ANALYSIS.**

A.   **DW Has Only a Limited Takings Claim.**

Under the Takings Clause of the Fifth Amendment and article 1, section 20 of the Hawaii constitution, a government may not take private property for public use without just compensation.  The remaining claim in DW's Complaint relies on federal and state law to assert an inverse condemnation constituting a temporary regulatory taking.  *See* Complaint, ECF No. 1-2, PageID #s 23-25.  An "inverse condemnation" claim seeks

36

to recover the value of property taken by a government for public use without formal condemnation proceedings such as the exercise of eminent domain. *See Black's Law Dictionary* 364 (11th ed. 2019).

Hawaii courts have looked to federal law in examining regulatory takings, noting that land use regulations can reduce the use of a property to such an extent that it constitutes a regulatory taking requiring just compensation. *See Leone v. Cnty. of Maui*, 128 Haw. 183, 190, 284 P.3d 956, 963 (Ct. App. 2012) (citing *Lingle*, 544 U.S. at 537-39). No party has argued that DW's state takings claim should be analyzed differently from any federal takings claim. The court therefore examines any takings claim in this case under federal precedent, which is more developed than Hawaii law.

While DW continues to attempt to assert extensive takings claims on behalf of itself and on behalf of Aina Le`a, DW's remaining claim is actually quite limited. Aina Le`a is not a party to this action and has not timely asserted claims. DW cannot assert Aina Le`a's claims by relying on an assignment of those claims to DW that the record establishes occurred not only after the Complaint in this matter was filed but also after the statute of limitations had run. Leave of court was never granted to expand the claims to include Aina Le`a's claims. DW is limited to claims it actually asserted in the Complaint, which is

37

silent as to any claims belonging to Aina Le`a.  *See* ECF No, 194,
PageID #s 4933-34 (conceding that the Complaint does not
expressly allege causes of action on behalf of Aina Le`a).  The
Ninth Circuit ruling that DW has standing to assert its takings
claim on the basis of an alleged financial loss sustained when
Aina Le`a failed to pay DW $17 million did not expand DW's claims
to include Aina Le`a's claims.

     With respect to the claims asserted in the Complaint,
this court previously ruled that the only remaining takings claim
was based on DW's right to possess the residential property under
the terms of the First Agreement, and that the only property
interest affected was the right to use the land to produce a
profit before the closing.  *DW*, 2022 WL 1665311, at *12.  Again,
the Ninth Circuit's determination that DW had standing to assert
a takings claim in no way affected those rulings, which were not
appealed and can no longer be challenged.

     Additionally, consistent with the Ninth Circuit's
ruling in *Bridge*, the relevant takings period began with the
LUC's written reversion order of April 25, 2011, and ended when
the state trial court reversed the LUC's order on June 15, 2012.

     In examining DW's damage claim, this court keeps in
mind the discussion in *Bridge* concerning appropriate just
compensation damages for temporary regulatory takings claims such
as DW's.  *Bridge*, 950 F.3d at 632 n.12.  That discussion refers

38

to a return on the taken property's fair market value, a factor
discussed later in this order.

> **B.    DW Has Conceded That Summary Judgment Should Be
> Granted in Favor of Hawaii in Light of the Court's
> Granting of Hawaii's Motion in Limine No. 8.**

As noted earlier, this court has granted Hawaii's
Motion in Limine No. 8, which sought to preclude DW from
presenting evidence of Aina Le`a's damages.  *See* ECF No. 284,
PageID #s 10558-59.

A hearing was held on February 6, 2024, on Motion in
Limine No. 8.  At that hearing, DW made the surprising statement
that, "if you grant this motion, Your Honor, I do not believe DW
has a case."  Transcript of Proceedings (Feb. 5, 2024), ECF No.
285, PageID # 10599.   The court then asked DW to clarify that
statement:

> THE COURT: . . . I want to go back for a
> moment to the  issue of Aina Le`a's damages.
> And I want to make sure there's no
> misunderstanding about what DW's position is.
>
> Are you saying, Mr. Sim, that if I
> grant Motion In Limine No. 8, which seeks an
> order precluding evidence of Aina Le`a's
> damages, which I've said I'm inclined to say
> that Aina Le`a's damages cannot come in, if I
> grant Motion In Limine No. 8, then DW has no
> case or some words to that effect.  So, is
> the granting, in your mind, of Motion In
> Limine No. 8 necessarily leading to the
> granting of summary judgment in favor of the
> State of Hawaii.  Is that your position?
>
> MR. SIM: Yes, Your Honor.

*Id.*, PageID # 10600.[1]

DW's admission that it has no viable takings claim if it cannot introduce evidence of Aina Le`a's damages demonstrates that DW is not attempting to enforce its own rights.  This is particularly unexpected given the allegations in the Complaint and DW's earlier arguments with respect to standing.  DW, after all, prevailed before the Ninth Circuit by arguing that DW itself had standing to proceed in this case.  DW is either now relinquishing that victory or admitting that it was never pursuing its own damages.

In essence, DW has admitted that it wants to stand in the shoes of Aina Le`a and assert any takings claim Aina Le`a might have or might have had.

In any event, having granted Hawaii's Motion in Limine No. 8 and thereby precluded evidence of Aina Le`a's damages, and taking DW at its word that it has no claim if precluded from seeking Aina Le`a's damages, the court grants summary judgment in favor of Hawaii.

In an abundance of caution, however, this court also addresses the merits of DW's takings claim, assuming that the

---

[1] DW's counsel's statements are not just the statements of a lawyer whose only relationship with the client is that of a lawyer.  Mr. Sims owns an entity that in turn is a member of the limited liability company that is DW.  *See* ECF No. 105-12, PageID # 2823.  In speaking about DW's case, he has a personal interest that makes it unlikely he was mispeaking.

Complaint is asserting DW's rights, as opposed to Aina Le`a's rights.

###    C.    The Undivided Fee Rule is Inapplicable.

Hawaii argues that DW cannot establish a taking because of the "undivided fee rule," which it says requires damages for a taking to be awarded to the fee owner and then apportioned to others (such as a lessee).  In its order of May 25, 2022, this court ruled, "Under Hawaii law, the purchaser of real property under an agreement of sale is treated as the owner of the property even before a sale closes."  *DW*, 2022 WL 1665311, at *11.  DW, the purchaser of the residential property, had the right to possess that property even before closing, assuming its contract was still in effect.  This court noted, "If a temporary regulation is only in effect before an agreement to sell real property closes, then the only property interest that is affected is the right to use the land to produce a profit before the closing."  *Id.*, at *12.  Thus, this court ruled that if DW had an ownership interest in the residential property, it could assert a takings claim based on the alleged right to possess the residential property.

Hawaii did not appeal that ruling and has therefore waived any argument that only Bridge (the fee owner during the temporary takings period) or Aina Le`a (the entity to which Bridge sold the residential property and the fee owner when this

41

Complaint was filed) had the right to assert a takings claim.  In other words, the court is allowing DW to proceed to show that it had a right to possess the property during the takings period. *See id.*, at *12-*13 (finding a question of fact as to whether DW had an ownership interest in the residential property given the potential default by DW with respect to the First Agreement).

### D.  Issue Preclusion Is Inapplicable.

Citing the earlier *Bridge* litigation, Hawaii argues that issue preclusion bars DW's takings claim.  When analyzing the preclusive effect of a federal court judgment, this court applies federal law.  *See GP Vincent II v. Est. of Beard*, 68 F.4th 508, 514 (9th Cir. 2023).  Generally speaking, "when a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." *Hydranautics v. FilmTec Corp.*, 204 F.3d 880, 885 (9th Cir. 2000).  Collateral estoppel, or issue preclusion, applies when:

> (1) the issue necessarily decided at the previous proceeding is identical to the one which is sought to be relitigated; (2) the first proceeding ended with a final judgment on the merits; and (3) the party against whom collateral estoppel is asserted was a party or in privity with a party at the first proceeding.

*Paulo v. Holder*, 669 F.3d 911, 917 (9th Cir. 2011) (quoting *Hydranautics*, 204 F.3d at 885).

42

Hawaii does not establish that this case involves the same parties or their privies as those involved in the *Bridge* case. In fact, the evidence of damages in the *Bridge* trial is likely different from what is in issue in the present case, which is looking at DW's right to possess the residential property during the takings period. The court declines to apply claim preclusion, although the Ninth Circuit's decision in *Bridge* is instructive with respect to many of the issues in this case.

**E.   DW May Offer Evidence of Its Damages During the Takings Period.**

Hawaii also argues that it is entitled to summary judgment because DW lacks an expert to testify with respect to damages. The court rejects Hawaii's argument. As this court noted in denying Hawaii's Motion in Limine No. 2, Wessels, a DW principal, may testify based on his own personal experience with respect to the value of the land. *See* ECF No. 284, PageID #s 10542-44. Wessels is competent to testify as a lay witness that, based on his experience, the residential property was only suitable for housing development. This court has already ruled that the failure by Wessels to consider any other use goes to credibility, rather than admissibility. *See* ECF No. 284, PageID # 10544. The court does not find that Wessel's lack of exploration of other possible uses for the residential property makes entirely irrelevant his view as a principal of DW that the

43

land was worthless.  Summary judgment is not warranted on the ground that DW lacks expert testimony.

   **F.   There Was No *Lucas* Taking.**

   A *Lucas* taking occurs when a regulation completely deprives an owner of "*all* economically beneficial us[e]' of her property."  *Bridge Aina Le`a*, 950 F.3d at 626 (quoting *Lingle*, 544 U.S. at 538; *Lucas*, 505 U.S. at 1019 (alteration in original)).

   DW attempts to show a *Lucas* taking by arguing that its developmental rights became worthless when the taking occurred, as opposed to arguing that the residential property became worthless.  However, DW raises no genuine issue of fact with respect to whether there was any economically beneficial or productive use of the property remaining after the alleged taking.  To begin with, this court ruled in its earlier summary judgment order that DW could not maintain its takings claim based on the contractual right to develop the residential property.  *DW*, 2022 WL 1665311, at *8-*10.  Any such claim is not now before this court.  *See Ortega*, 50 F.3d at 780; *see also JGR, Inc.*, 550 F.3d at 532; *Escobar-Urrego*, 110 F.3d at 1560.

   Given the court's earlier ruling, DW must base its *Lucas* takings claim on its alleged right to possess the residential property.  There is no genuine issue of fact with respect to whether that right to possess the residential property

44

was worthless during the approximately one-year takings period. It was not.  The Ninth Circuit determined in *Bridge* that the very same land still had value in an agricultural use classification for the same takings period, precluding a *Lucas* takings claim. *See* 950 F.3d at 628-29.  The Ninth Circuit also determined that the permissible uses of the agricultural land did not deprive Bridge of all economically viable uses of it.  *Id.* at 629.  The Ninth Circuit rejected Bridge's argument that its inability to pursue a particular development was a total taking.  *Id.* at 630. That rejected argument is essentially the argument DW is making now.  While DW contends that there was no agricultural use for the property because it consists primarily of lava fields and building pads that need infrastructure, *Bridge* already determined that the very same land still had economic value during the takings period.

Moreover, the residential property, under agricultural zoning, could still be used for matters unrelated to traditional agriculture.  *See* Haw. Rev. Stat. § 205-2(d) (permitted uses for agricultural land include wind generated energy production, biofuel production, and solar energy production, among other uses).  *Bridge* held that the land had some remaining value and that there were other permitted uses of the land (e.g., a solar or wind farm).  This court likewise concludes that the land had

45

some remaining value when its zoning was reverted to agricultural use.

Even if DW relies on the LUC's 1991 order that found that the "Property is not suitable for agriculture," *see* ECF No. 142-4, PageID # 3322, as argued in its trial brief, *see* ECF No. 219, PageID # 5730, that reliance does not win the day. The 1991 order did not consider the other permissible uses for the property, instead concluding that it was not suitable for agriculture given "the extremely poor quality of the soils, lack of rainfall, and the lack of low-cost agricultural water." ECF No. 142-4, PageID # 3295.

Additionally, the temporary nature of any regulatory taking here refutes DW's assertion of a *Lucas* taking. Even under DW's theory that the developmental rights were worthless during the takings period, the alleged taking was temporary. In *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, 535 U.S. 302 (2002), the Supreme Court considered whether two moratoriums lasting a combined 32 months could qualify as a *Lucas* taking. The Supreme Court held that such temporary takings are better analyzed under the *Penn Central* rubric, although the Court eschewed a categorical rule. Under *Lucas*, compensation is required when a regulation deprives an owner of "*all* economically beneficial uses" of the land. *Tahoe-Sierra Pres. Council*, 535 U.S. at 330. *Lucas* was limited

46

to the extraordinary circumstance when "*no* productive or
economically beneficial use of land is permitted." *Id.* Anything
less than a complete elimination of value requires a *Penn Central*
analysis, rather than a *Lucas* analysis.

In *Tahoe-Sierra Pres. Council*, the Supreme Court said
courts should examine whether a total taking of an entire parcel
has occurred, not just a total taking of a temporal segment of
the parcel. *Id.*

> Hence, a permanent deprivation of the owner's
> use of the entire area is a taking of "the
> parcel as a whole," whereas a temporary
> restriction that merely causes a diminution
> in value is not. Logically, a fee simple
> estate cannot be rendered valueless by a
> temporary prohibition on economic use,
> because the property will recover value as
> soon as the prohibition is lifted.

*Id.* at 332.

The temporary nature of the alleged regulatory taking
in this case did not render the entire property worthless, as the
LUC's reversion order was reversed and the land became classified
as urban again. Wessels admitted that, when the LUC's 2011
written reversion order was invalidated, "the land had value."
ECF No. 178-2, PageID # 4527. No *Lucas* taking occurred.
Accordingly, to the extent DW's takings claim is premised on a
*Lucas* taking, summary judgment is granted in favor of Hawaii.

G.   **There was no *Penn Central* Taking.**

The *Penn Central* takings analysis examines three factors to determine whether a regulatory taking is the functional equivalent to a classic taking.  This court concludes that DW suffered no *Penn Central* taking.

1.   **Economic Impact.**

With respect to asserted *Penn Central* takings, courts first examine the regulation's economic impact on the property owner, comparing the value that has been taken from the property with the value remaining in the property.  *See Bridge Aina Le`a*, 950 F.3d at 630-31.  Economic impact does not support a *Penn Central* taking in this case under the facts presented.

DW does not directly compare the value taken from the property with the value remaining in it.  DW has identified no evidence with respect to the value of the property before the taking.  At best, DW can tie the value of the property before the taking with what DW agreed to pay for it in February 2009 and what Aina Le`a paid for it in 2015.  *See* ECF No. 142-8 (reflecting Bridge's agreement to sell the 1,060 acres to DW for $40,700,000); ECF No. 142-13 (reflecting Aina Le`a's agreement to pay an additional $14 million for the property).  Nor may DW introduce evidence of land value based on the "subdivision approach," also known as the "lot method" or "developer's residual approach."  In granting Motion in Limine No. 6 this

48

court has barred such evidence as too speculative, given DW's failure to demonstrate that it actually had the ability to build the housing.  *See* ECF No. 284, PageID #s 10550-55.

Wessels might opine that the value of the land when classified as agricultural was zero, but Wessels does not address the temporary nature of the alleged taking, or the proper time frame.  Wessels also appears to be equating the value of the land with the value of the development rights.

In *Bridge*, the Ninth Circuit applied a projected rate of return to the diminution in land value to examine the reversion's economic impact.  The record contains no admissible evidence of any relevant market rate of return.  Wessels's assertion that DW hoped for a 12 percent return on its investment was based on an analysis done by someone else, *see* Videotaped Videoconference Depo. of Expert Robert J. Wessels, ECF No. 207-5, PageID # 5038, and, in any event, can only be presented in DW's rebuttal case at trial because Wessels was not timely named as an expert for purposes of DW's case in chief.  *See* ECF No. 189. DW's case in chief will thus be devoid of the necessary evidence of the economic impact the reversion had on the land value before and after the reversion.

Instead of actually examining the economic impact of the reversion on the property, DW bases its economic impact

assertion on its claim of lost profits.  Even assuming that were tenable, DW does not support is claim of lost profits.

Wessels says that DW lost $22,270,364 in profits during the takings period.  *See* ECF No. 190-1, PageID # 4767.  Wessels explains that, because DW's funding stopped, it lacked funds to complete the utilities necessary to obtain the certificates of occupancy for the first sixteen affordable units.  Because it could not sell those sixteen units, DW lost cash flow from the sales of those units that could have been used to fund construction of additional units, ultimately leading to the $22,270,364 in lost profits.  *See id.*

DW has conceded, however, that funding was lost when the LUC held a voice vote in 2009.  That vote was preliminary and, in fact, later rescinded.  The lost funding was not caused by the LUC's 2011 written reversion order.  *See* ECF No. 194, PageID #s 4936-37 (admitting that the flow of funding to DW stopped upon the LUC's 2009 oral vote, rather than upon the issuance of the written order reverting the property).

In *Bridge*, the Ninth Circuit concluded that DW's contractual default after the same loss of funding following the LUC's voice vote did not support the conclusion that the written order had any economic impact.  950 F.3d at 633 (ruling that contractual defaults caused by DW's inability to borrow money as a result of the LUC's 2009 oral vote occurred two years before

the 2011 reversion order that began the takings period and therefore did not affect any economic impact caused by that later written order). This court reaches the same conclusion here: the LUC's written reversion order (starting the alleged taking) did not cause the alleged lost profits. This court has previously addressed why the takings period must be tied to the LUC's written order. *See* Order Granting Motion in Limine No. 3, ECF No. 284, PageID #s 10545-46 (precluding DW from introducing evidence that its damages include lost profits outside of the takings period), and Order Granting in Part Motion in Limine No. 5, ECF No. 284, PageID #s 10547-10550 (examining dates of takings period).

On page 15 of its opposition, ECF No. 170, PageID # 4365, DW says that, "as a result of the reversion, DW had to pay an additional $14 million more than the previously agreed upon $40.7 million to purchase the land." The Declaration of Robert Wessels also states that "DW did not close on the purchase under the purchase agreement until a later date." ECF No. 190-1, PageID # 4766. While the Ninth Circuit has stated that DW purchased the property, *see* 950 F.3d at 633, DW conceded at the hearing on these motions (and the record establishes) that it was Aina Le`a, not DW, that actually purchased the property. *See* ECF No. 194, PageID # 4938. DW never had to pay an additional $14 million more than the original price.

In claiming $14 million in lost profits, DW appears to be conflating Aina Le`a and DW, treating Aina Le`a as DW despite their parent-subsidiary relationship.  While DW and Aina Le`a treat themselves as separate entities in responding to creditors, and only Aina Le`a filed for bankruptcy, DW merges the entities when that benefits DW.  DW's claim that it purchased the property for $14 million more flies in the face of the record, which establishes that Aina Le`a was the purchaser.

On motions for summary judgment, this court is not required to treat any factual assertion as true that so blatantly disregards the record that no reasonable jury could believe it.  *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").  This court disregards DW's attempt to conflate Aina Le'a with DW.  There is no genuine issue of fact with respect to whether DW paid $14 million more for the residential property after the reversion order.

The court notes that, while the Ninth Circuit ruled that DW had standing to support its takings claim based on a $17 million debt Aina Le`a owed to DW, DW has presented no evidence to this court demonstrating that DW's ability to recover any of

52

that money was diminished or destroyed by the temporary regulatory taking at issue here.  DW does not, for example, show that Aina Le`a would or could have paid all or more of that amount without the alleged taking.

DW's failure to demonstrate any economic impact caused by the reversion order weighs heavily in favor of the conclusion that no *Penn Central* taking occurred.

### 2.   Investment-Backed Expectations.

The next *Penn Central* factor examines the extent to which a regulation has interfered with distinct investment-backed expectations, using an objective analysis focused on interference with reasonable expectations, not a "starry-eyed hope."  *See Bridge*, 950 F.3d at 633.

DW argues that, with no sales during the fourteen-month takings period, DW lost $22,270,364 in profits.  *See* ECF No. 190-1, PageID # 4767.  As demonstrated in the previous subsection, however, the alleged lost profits were premised on lost funding that occurred after the LUC's 2009 voice vote and before any taking began in 2011.  Even if the court assumes that this hoped-for profit of $22,270,364 was reasonable and was lost because funding dried up in response to the LUC's actions, the reversion order did not meaningfully interfere with the profits during the takings period.

In *Bridge*, the record reflected that Bridge had hoped to make a 20 percent return on its total investment. *See* 950 F.3d at 634. The Ninth Circuit noted that the reversion could not have meaningfully interfered with this return unless and until the LUC's affordable housing condition was modified. *Id.* The Ninth Circuit noted that Bridge and DW had repeatedly represented that they would complete the required 385 affordable housing units by November 2010. The Ninth Circuit ruled, "The operative conditions in place at the time of the [order to show cause] and the Reversion Order, and Bridge's failure to meet them, dispel the notion that Bridge could reasonably expect that the Commission would not enforce the conditions." *Id.* at 635. The Ninth Circuit stated, "[W]e do not see how the Reversion Order interfered with any reasonable expectations that Bridge could have formed regarding enforcement or reversion. Accordingly, we conclude that, as a matter of law, this factor [the extent of any interference with any reasonable investment-backed expectations] weighs strongly against finding a taking."

While DW was not a party to *Bridge*, the *Bridge* holding is instructive. It is uncontested that Bridge and DW promised to build 385 affordable housing units no later than November 2010. They did not build those units by that date (or indeed ever). It was thus not reasonable as a matter of law for DW to have

expected millions of dollars of profits during the takings period.

The court notes that, unlike in *Bridge*, DW has identified no admissible evidence that it can introduce in its case in chief at trial demonstrating its reasonable investment-backed expectations that were interfered with by the reversion. At most, Wessels was properly identified only as a rebuttal expert and, in that capacity, testified that DW hoped for a 12 percent return on its investment. *See* Videotaped Videoconference Depo. of Expert Robert J. Wessels, ECF No. 207-5, PageID # 5038. Wessel's status as a rebuttal expert would not allow him to testify about a 12 percent rate of return in DW's case in chief. That is, DW has not identified any evidence admissible in its case in chief that raises a genuine issue of fact with respect to DW's reasonable investment backed expectations.

Even if it had such evidence, as discussed above, the investment-backed expectations would weigh strongly against a *Penn Central* taking because DW fails to present any evidence tending to show that the reversion meaningfully interfered with those expectations.

### 3.   The Character of the Government's Action.

DW argues that, because the character of the governmental action in question only affected it, that character should weigh in favor of finding a taking.  But in *Bridge*, the

55

Ninth Circuit rejected a similar argument, stating that "[t]he
concentrated effect of the reversion here, however, was
reflective of the confines of a generally applicable Hawaii law
land use reclassification procedure. . . .  We cannot find in
this generally applicable scheme that this factor weighed in
Bridge's favor."  *Bridge Aina Le`a*, 950 F.3d at 636.  The Ninth
Circuit also noted that the invalidation of the LUC's reversion
order was based on a statutory procedural requirement such that
it did not "carry the constitutional significance that Bridge or
the district court ascribed to it."  *Id.*  Given the long history
of representations and the failure to meet deadlines, the
reversion was not clearly arbitrary and unreasonable.  *Id.*  This
"underlying history blunts the force of Bridge's assertion that
the reversion's character established a taking."  *Id.*  Applying
this reasoning, this court determines that the third *Penn Central*
factor does not support a taking.

### 4.    The Three *Penn Central* Factors Do No Demonstrate a taking.

Having balanced the three *Penn Central* factors, the
court concludes that no *Penn Central* taking occurred.
Accordingly, to the extent the remaining takings claim asserts a
*Penn Central* taking, summary judgment is granted in favor of
Hawaii.

In making this ruling, this court recognizes that DW is
not entirely without evidence of a taking.  This court, for

56

example, is allowing Wessels, a DW principal, to provide some testimony about value.  However, in examining a summary judgment motion, a court considers not only whether there are questions of fact but also whether the party bearing the burden of proof at trial has made some showing as to how it will meet that burden. In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986), the Supreme Court explained:

> we are convinced that the inquiry involved in a ruling on a motion for summary judgment . . . necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits.  If the defendant in a run-of-the-mill civil case moves for summary judgment . . . based on the lack of proof of a material fact, the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented.  The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.  The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict—whether there is evidence upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.

*Id.* at 252 (quotation marks and alterations omitted).

DW will have the burden at trial of proving its takings claims by a preponderance of the evidence.  DW makes no showing as to how it might meet that burden.

**H.  Even if DW Can Present Evidence of a Temporary Regulatory Taking, It Fails to Demonstrate That it Has Admissible Evidence of Its Just Compensation Damages.**

*Bridge* set forth how just compensation damages are calculated in a temporary regulatory takings case, stating that "the landowner should be awarded the market rate return computed over the period of the temporary taking on the difference between the property's fair market value without the regulatory restriction and its fair market value with the restriction."  950 F.3d at 632 n.12.

DW has agreed that this is the proper measure of damages.  *See, e.g.,* ECF No. 220, PageID #s 5377-79.  In opposing a motion in limine seeking to preclude evidence pertaining to DW's name and business reputation, DW explained that this calculation of damages allows "the landowner [to] recover[] what he lost.  To award any affected party additional compensation for lost profits or increased costs of development would be to award double recovery: the relevant fair market values by definition reflect a market estimation of future profits and development costs . . . ."  ECF No. 258, PageID # 9047.  *See also United States v. Gen. Motors Corp.*, 323 U.S. 373, 379, 65 S. Ct. 357, 360, 89 L. Ed. 311 (1945) (noting in an eminent domain case that just compensation does not include lost profits, expense of moving, loss of goodwill, and other consequential losses); *Ideker Farms, Inc. v. United States*, 71 F.4th 964, 987 (Fed. Cir. 2023)

58

(ruling that consequential damages, such as lost profits, loss of goodwill, and cost of moving to a new facility, are not awardable under the Fifth Amendment); *United States v. 10.56 Acres, More or Less, situated in Whatcom Cnty., Wash.*, 2008 WL 3977614, at *5 (W.D. Wash. Aug. 22, 2008) (ruling that consequential damages, including opportunity costs, lost profits, loss of goodwill, and relocation expenses, are not compensable under the Fifth Amendment).

Given the proper measure of just compensation damages in this case, the court has granted several motions in limine seeking to preclude certain evidence of damages.  With respect to Motion in Limine No. 3, this court has ruled that, in attempting to prove just compensation, DW is precluded from presenting evidence of consequential and contract damages, including lost profits and other losses incurred as a result of interference with contract rights, such as a loss of funding leading to lost sales and DW's alleged purchase of the residential property for more money in a subsequent year.  *See* ECF No. 284, PageID #s 10544-46.  With respect to Motion in Limine No. 4, the court precluded DW from introducing evidence and arguing that it is entitled to damages based on lost development rights.  *See* id., PageID #s 10546-47.  With respect to Motion in Limine No. 6, the court precluded DW from introducing evidence of land value based on the "subdivision approach," as that evidence is too

speculative.  *See* id., PageID #s 10550-55.  With respect to Motion in Limine No. 9, the court precluded DW from introducing evidence of damages arising out of harm to its business name or reputation.  *See* id., PageID # 10559.  Finally, with respect to Motion in Limine No. 16, the court precluded DW from introducing evidence of damages for delays in the development of the property.  *See* id., PageID #s 10567-68.

In moving for summary judgment, Hawaii argues that DW cannot establish the fair market value of its property interest with and without the reversion, including the market rate of return, as required by the discussion in *Bridge* about how to measure damages in a temporary regulatory takings case.  *See* ECF No. 141, PageID # 3194.  The court agrees that DW does not show that it can meet its burden with respect to proving just compensation damages.  Summary judgment is granted in favor of Hawaii.[2]

_____

[2] The court notes that DW's evidence of what the property was worth before and after the reversion is sketchy.  At best the record reflects what DW paid for it and what Aina Le`a subsequently paid for it.  DW has not identified any other admissible evidence that it may present in its case in chief with respect to the valuations of the property before and after the reversion.

## V.         CONCLUSION.

Hawaii's summary judgment motions, ECF Nos. 141 and 143, are granted with respect to the remaining takings claim asserted in Count I of the Complaint.  The Clerk of Court is directed to terminate all pending motions and deadlines, to terminate calendar entries, to enter judgment in favor of Hawaii, and to close this case.


It is so ordered.

DATED: Honolulu, Hawaii, February 12, 2024.



/s/ Susan Oki Mollway
Susan Oki Mollway
United States District Judge


*DW Aina Le`a Development, LLC, v. State of Hawaii, Land Use Commission, et al.*, Civ. No. 17-00113 SOM/WRP; ORDER GRANTING MOTIONS FOR SUMMARY JUDGMENT BASED ON NO LIABILITY (ECF NO. 141) AND LACK OF EVIDENCE (ECF NO. 143) IN FAVOR OF DEFENDANTS